TAYLOR *v.* GOLDSMITH.

1. APPEAL AND ERROR—NEW TRIAL—WEIGHT OF EVIDENCE.
   That the verdict is against the weight of the evidence should be presented to the trial court in a motion for a new trial.[1]

2. PLEADING—DENYING MOTION TO AMEND CHANGING THEORY OF DEFENSE WITHIN COURT'S DISCRETION.
   Where the theory of the defense, in an action for the breach of a contract for the sale of sugar, both in plead-

[1] Appeal & Error, 4 C. J., § 960.

ings and proof was that plaintiffs had breached the contract, there was no abuse of discretion in denying a motion to amend by adding a further special notice to the effect that defendant's wife, who signed the contract for him, had been fraudulently induced to so sign, offered after plaintiffs had rested and after defendant had been examined and cross-examined.[2]

3. EVIDENCE—ORAL TESTIMONY INADMISSIBLE TO VARY TERMS OF WRITTEN CONTRACT.

Where defendant ordered in writing "standard American cane granulated sugar," and was allowed to introduce testimony as to the meaning of said term to the trade, there was no error in excluding testimony to the effect that he bought the product of a certain refinery rather than that of those furnished him, where the product of all of them was of said class, since said testimony would vary the plain terms of the written contract.[3]

4. APPEAL AND ERROR — EVIDENCE — ADMISSIBILITY — HARMLESS ERROR.

Where defendant claimed that plaintiffs breached the contract by furnishing to him sugar that was lumpy and dirty, the admission of testimony by other customers that they bought good sugar from plaintiffs and that it was neither lumpy nor dirty, *held*, not prejudicial error, in view of other testimony showing that said sugar came out of the same warehouse and same lot and at about the same time as that furnished to defendant, which he accepted and sold, although the propriety of such testimony is questioned.[4]

5. SALES—DAMAGES—BREACH OF CONTRACT—UNIFORM SALES ACT.

Under the uniform sales act (3 Comp. Laws 1915, § 11895), in case the buyer wrongfully neglects or refuses to accept and pay for the goods, "where there is an available market for the goods in question, the measure of damages is * * * the difference between the contract price and market or current price at the time or times when the goods ought to have been accepted."[5]

6. SAME—SINGLE SALE EVIDENCE OF MARKET.

Proof of a single sale is evidence of a market.[6]

7. SAME—QUESTIONS OF LOCAL MARKET AND DILIGENCE OF PLAINTIFFS IN SELLING FOR THE JURY.

Whether there was a local market for sugar at the time

[2]Pleading, 31 Cyc. p. 425; [3]Evidence, 22 C. J. § 1475; [4]Appeal & Error, 4 C. J. § 2962; [5]Sales, 35 Cyc. p. 592; [6]Id., 35 Cyc. p. 594.

defendant breached his contract by refusing to accept the balance of his order, and whether plaintiffs exercised due diligence to secure the best price obtainable, *held*, questions of fact under conflicting testimony.[7]

8. SAME—MEASURE OF DAMAGES.

If plaintiffs furnished or offered to furnish goods of the kind and quality the order called for, and defendant breached his contract, leaving them with the goods in their hands, they were entitled, after due notice given him, to sell the same on the open market at the best price obtainable and hold him for the difference between what they sold it for and the contract price, with interest on such difference and the necessary cost of selling.[8]

9. SAME—DUTY OF SELLER TO EXERCISE DILIGENCE.

Delay of the seller to act with reasonable expedition to save greater loss on a demoralized and falling market may be evidence of failure to exercise due diligence.[9]

10. SAME—TRIAL—INSTRUCTIONS.

In view of the testimony as to the demoralized condition of the sugar market not only locally but throughout the country, the action of the trial judge in submitting to the jury the questions of the market price and whether plaintiffs exercised due diligence to obtain the best price obtainable, *held*, not open to the objection that he wholly disregarded the fact that there was a "market price" for sugar which was the only basis for measuring plaintiffs' damages.[10]

Error to Wayne; Shepherd (Frank), J., presiding. Submitted January 31, 1924. (Docket No. 153.) Decided October 6, 1924.

Assumpsit by Hedley V. Taylor and others, copartners as Taylor, McLeish & Company, against Abraham Goldsmith for breach of a contract of sale. Judgment for plaintiffs. Defendant brings error. Affirmed.

*William Henry Gallagher*, for appellant.

*William J. Griffin* (*George B. Murphy*, of counsel), for appellees.

---

[7]Sales, 35 Cyc. p. 600; [8]Id., 35 Cyc. pp. 598, 599; [9]Id., 35 Cyc. p. 598; [10]Id., 35 Cyc. p. 601.

STEERE, J.   Plaintiffs are a copartnership engaged in the wholesale grocery business in the city of Detroit.   Defendant is, as he testified, a wholesale fruit dealer in said city and at the time this controversy arose also dealt in sugar and other produce.   On September 30, 1920, plaintiffs, through a broker agent named Corso, sold defendant 1,000 sacks of Standard American sugar at $13.60 per sack.   The sale was evidenced in writing by a memorandum of agreement prepared in duplicate by Corso on a blank order slip of the form commonly used for such transactions which he signed as salesman and defendant as purchaser by his wife who, as he testified, had helped him in his business for years.   Corso testified that when he called at defendant's store he asked him if he was in the market for sugar, to which he replied in the affirmative and asked the price.   Corso told him it was $14 per bag for American cane and defendant offered $13.50.   Corso then called up plaintiffs, using defendant's 'phone, and advised them of the offer which they declined to accept, but after further negotiations with defendant and on his suggestion he called them up again and was finally authorized to accept $13.60 on the terms stated in the order slip which he then prepared, with carbon copies as was the practice, and passed to defendant to sign, who told his wife to "sign the order" as he was just starting to wait on a customer who came in.   This she apparently did, and Corso left with them the original. He admitted when confronted with it that he was unable to translate her hieroglyphics.   Defendant said he came from Russia 16 years before.   She stated that she came to Detroit 12 years before and had always helped him in his store, was unable to read or write English but could write Jewish and Russian.   Defendant denied being present when this order was given, or having instructed his wife to sign it, and asserted "I never talked with Mr. Corso at all;" but

admitted that he saw him in the store and signed the $300 check which Corso received in compliance with the terms of the order. The copy delivered to defendant was produced at the trial. So far as material it is as follows:

"Dated 9-30-1920.

"Sold to—A. Goldsmith.
"Place—375 Russell.
"To be shipped by—Taylor McLeish.
"Routing—To be pick up.            F. O. B. Store.
"All orders are subject to seller's confirmation.
\*   \*   \*

"1000 sx Std. Am. Cain Granulated Sugar—$13.60.
"$300 deposit to be held until last of sugar is picked up and will pay for each shipment, when pick up, to clean up lot by Oct. 8, 1920.
"Buyer sign here—(said to be illegible).
"Sales sign here—M. B. Corso."

Robert McLeish, of plaintiffs' firm, testified that the next day after they received this order, early in the forenoon of October 1, 1920, defendant came to their place of business and inquired for him. He said his name was Goldsmith, he had bought 1,000 bags of sugar which he wanted to look at and see if it was all right before he took it. McLeish then showed him the sugar, which was all American refined sugar of the Franklin, American and Warner refineries, put up in 100 pound sacks and stored on the first floor of their warehouse; defendant looked at it, pulled down some of the sacks, said the sugar was all right so far as he could see, but pointed out one or two sacks that were torn and said he didn't want any torn sacks. McLeish told him "he need not take anything but what was all right," and he left expressing himself as satisfied with the sugar. He did not come again or ever make any complaint to McLeish of its quality. All this is absolutely denied by defendant. He testified that he never was at plaintiffs' place of business, or warehouse, did not know where it was, did not send

any one down there to look at the sugar and the first time he ever saw McLeish was in the court room.

It is undisputed that on October 1, 1920, defendant sent his truck to plaintiffs' warehouse for a load of sugar and took 100 sacks, which was repeated the next day.    Plaintiffs' shipping clerk, who looked after the delivery and checked out the sacks, testified that all those delivered were good sacks of sugar in good condition; that any sacks objected to because the sugar was a trifle hard from the weight of those piled above them and a few with small holes in the sacks were rejected.    This is disputed by a colored man who worked for defendant and went with the truck for the sugar.    He testified that defendant instructed him not to accept any sugar which was lumpy and in torn bags but when he objected to any such the four white fellows who were delivering it to him "started to argue" and says, "I couldn't whip all them guys there by myself, you know, so I took what they gave me and brought it back to Goldsmith."    When the first truck load arrived at defendant's store he and his wife looked it over, left it in the truck in front of their store for some time, during which they sold several sacks of it, and then unloaded the rest, piling it up in the store.    The next day defendant sent his man for another truck load.    He testified to a repetition of experience at plaintiffs' warehouse, and explained that he did not drive away without the sugar "because I was afraid they would hit me on the head."    On each occasion defendant left the truck load of sugar standing in front of his store for some time and sold from it what he could, then unloaded the rest into his store.    He sold all of both truck loads during the week, although he testified that his truck driver when he returned with the first load called his attention to the poor condition of the sugar, that he then examined the load, felt the sacks, opened and examined two or more, saw it was lumpy and "the

sugar was kind of dark" and it looked to him as though the whole load was lumpy.    Of the amount he sold before unloading he said:

"I don't remember how many sacks of the first truck load I sold to grocers off the load.    Maybe a dozen, maybe more, maybe less.    I don't remember exactly how many we sold at that time.    I haven't any idea how many.    I am sure I sold some.    I don't remember who I sold them to.    I didn't keep any record."

He claims to have 'phoned to plaintiffs on October 2d, after the second truck load was received, notifying them of the poor quality and condition of the sugar.    This plaintiffs deny.    Square issues of this nature run all through the testimony and were submitted by the court to the jury under careful instructions.

Plaintiffs' testimony showed that in the early part of 1920 there had been an acute shortage of sugar in the United States, the supply being yet under control of the war sugar equalization board which allotted sugar to the various countries according to population, allotments being sold on the basis price of raw sugar in Cuba.    They bought the sugar sold to defendant in the spring of 1920 and paid from 22 to 23 cents a pound for it.    This sugar was received by plaintiffs in August and September, the terms of purchase requiring immediate payment.    Because of the condition of American exchange various other countries started in July to ship sugar from their allotments and production to this country, and from then on it arrived in large quantities, resulting in a surplus for this country, with rapid decline of prices and demoralization of the market.    Under that situation defendant was sold, on September 30, 1920, the 1,000 bags of sugar at 13.60 cents per pound, which had cost plaintiffs from 22 to 23 cents a pound, to be all picked up by him and paid for by October 8, 1920.

As the time approached for completing his contract

and defendant took no more sugar after the two truck loads, plaintiffs sent Corso to inquire why he was not picking up the rest of his order.    He testified that defendant made no complaint to him of the quality of the sugar  but gave no satisfactory reply, saying he "did not want it," had until the "last of the week to take that out," would do as he pleased with it, etc., and later, in reply to his inquiry by 'phone, defendant's wife only said that they didn't want any more sugar.

On October 9th, after the time for performance of his contract expired, plaintiffs notified defendant that on account of the uncertainty of the sugar market and to protect the interests of all parties they would sell the balance of the sugar he had not taken under his contract and "charge to your account any part to go through with the balance."    To this notice which was personally served on him he paid no attention.    They then put the 800 sacks on the market and endeavored to find a purchaser, but owing to the surplus of sugar then in Detroit and demoralized condition of the market were able after canvassing the wholesalers, brokers and jobbers in Detroit to find but a single bidder, the Standard Fruit Company, which offered $9 a sack, while plaintiffs offered to take $10.    After negotiating for some time to secure a better price plaintiffs finally sold the sugar to that company for $9.35 and afterwards brought this action against defendant to recover the difference between that and the price he contracted to pay.    The trial resulted in a verdict and judgment for plaintiffs of $3,410.

Defendant's 47 assignments of error are narrowed to the following alleged errors as stated and argued in his counsel's brief:

"(1)  Denial of motion to amend plea.
"(2)  Exclusion of evidence explanatory of language of written contract.

"(3) Admission of evidence of resale price, there being a market price.

"(4) Admission of testimony of resale price, the resale not being fairly conducted.

"(5) Admission of evidence of delivery of sugar of good quality to customers other than defendant.

"(6) Errors in charge of court. (a) In the construction of the contract. (b) In failure to charge a true measure of damages. (c) In submitting the case to the jury upon erroneous theory of issues presented. (d) As to meaning of 'due diligence' in effecting a resale.

"(7) Verdict is against the weight of the evidence."

Of the last ground stated it is sufficient to say that it was not presented to the trial court in defendant's motion for a new trial, and if it had been we are not persuaded that the verdict should be disturbed for that reason.

The case was exhaustively tried by both sides. Defendant's motion to amend was made after plaintiffs had introduced their testimony and rested, defendant's counsel had made his opening statement, and defendant himself had given his testimony on direct and cross-examination. While his wife was on the stand being examined by his counsel he asked her what talk she had with Corso on the date he went to their store to sell some sugar. This was objected to as being an attempt to vary the terms of a written contract, and defendant's counsel then moved to amend the plea by adding a further special notice to the effect that she had been fraudulently induced by Corso to sign the memorandum by misrepresentation as to the kind of sugar they were ordering. Up to that time, so far as this record discloses, the theory of the defense both in pleadings and proof was plaintiffs' breach of contractual relations, not that the contract was induced by fraud, but that he refused to go on with the contract because the sugar plaintiffs furnished him was discolored, dirty, lumpy and not of merchantable

quality as required by the contract. We find no abuse of discretion in denying the motion at that stage of the proceedings.

Defendant's exception to exclusion of evidence explanatory of language of the contract is apparently directed to exclusion of offered testimony by him to show that he only bargained for and bought the product of the American Sugar Refining Company called H. & E., while plaintiffs furnished him mostly products of the Franklin and Warner refineries. Counsel do not point out, and we do not discover, that any testimony, expert or otherwise, as to the meaning of terms used in the contract was excluded. He introduced testimony to the effect that "American cane" was not in common use in the trade and did not have any special trade meaning. It was, however, shown that "Std. Am." meant "Standard American" and "Standard American cane granulated sugar" meant, when this contract was made, granulated cane sugar, as distinguished from beet, of American manufacture or refining, as distinguished from foreign, of standard brands, and that the product of the Franklin, American and Warner refineries was of that class. Defendant inspected the sugar before he sent for it, and saw the marking upon the sacks indicating the brands. Plaintiffs delivered to his truck driver and he received 200 sacks composed of Warner, Franklin, American, or H. & E., brands of such sugar. This he again inspected, accepted and sold. We find no error in the ruling of the court excluding offered testimony which would vary the plain terms of the written contract.

Defendant's claimed error in admission of evidence of delivery of sugar of good quality to customers other than defendant is directed to the testimony of three customers of plaintiffs who briefly testified that they bought good granulated sugar from them about the time of defendant's purchase and it was neither lumpy

nor dirty.    While not impressed with the probative quality or propriety of that class of testimony, we are not prepared to hold that its admission was prejudicial error, in view of other testimony in the case showing that their sugar came out of the same warehouse and same lot of sugar, at about the same time and was delivered on a pick up order in the same way as that of defendant which, although he accepted and sold it, he denounced in truck load lots as dirty, lumpy and unmerchantable.

Defendant's urged error in admission of evidence of an unfairly conducted resale, because made in haste below the market price, apparently points to the theory that a verdict should have been directed for the defense on those grounds.    Defendant proved that in the usual course of trade the Detroit market price of sugar is determined by New York quotations plus the freight rate to Detroit, and contends that price should be the test here, which plaintiffs ignored and hastened to sell the sugar regardless of the market price, on the day following expiration of the contract time limit at the week's end when there is generally little or no market for sugar and wholesalers and jobbers ordinarily close their places of business in the afternoon.

Against this contention plaintiffs introduced testimony to show that at the time defendant breached his contract and left the sugar he had purchased on their hands the New York market did not and could not fix or control the Detroit market; that from a soaring price to 23 or 24 cents a pound, during a period of scarcity earlier in the year, the American market had been broken by a surplus of imported sugar and fallen to a buyer's market beyond regulation, sellers getting what they could to save losses with a falling market not yet at the bottom.    It was shown that the American Sugar Refining Company, the largest in the country, had quit quoting prices and withdrew

from the market to help stabilize it.   Its representative in Michigan testified that during the latter part of September and in October the Detroit market was "in a complete demoralized condition,   *   *   *   it was a buyer's market, whatever you could get people to pay for it—on a sliding scale, anywhere from $3 to $5 under the present refiner's market, anywhere then from $7 to $9 a sack."   Other qualified witnesses testified to like effect.   Defendant's witness VanNess, a sugar broker, testified of the price in Detroit during that period, "The price was whatever you could get for it.   There was no regular market." Defendant's witness Kerby, a broker who handled sugar in Detroit, explained the daily reports of the trade, etc., and said amongst other things:

"To find out what sugar was selling for in Detroit at that time you would have to ask each jobber in Detroit what they were offering their sugars at.   With the market demoralized, as it was in September, 1920, and in October, 1920, the only way you could tell what sugar was selling for would be the market under those conditions.   What a jobber would sell for in Detroit would not be the market at all.   *   *   *   When I say the Detroit market I do not mean that that reflects what sugar was selling for in Detroit.   It just means the refiners' market.   I am only talking about that and by saying that the refiners' market, in New York, October 8, 1920, we will say is $11 and by adding the freight to that would not necessarily reflect what sugar was actually selling for in Detroit at that time, you could not tell anything about that, that is just a market quotation."

It was shown that such demoralized sugar market conditions were not local to Detroit but general throughout the country.   Our uniform sales act (3 Comp. Laws 1915, § 11895) reads in part as follows:

"Where there is an available market for the goods in question, the measure of damages is   *   *   *   the difference between the contract price and market or

current price at the time or times when the goods ought to have been accepted." * * *

It is said that proof of a single sale is evidence of a market. Whether there was a market for sugar in Detroit at that time, what it was and whether plaintiffs exercised due diligence to secure the best price obtainable were amongst the many material questions which conflicting testimony made issues of fact.

If plaintiffs furnished or offered to furnish goods of the kind and quality the order called for, and defendant breached his contract, leaving them with the goods in their hands, they were entitled, after due notice given him, to sell the same on the open market at the best price obtainable and hold him for the difference between what they sold it for and the contract price, with interest on such difference and the necessary cost of selling. Delay to act with reasonable expedition to save greater loss on a demoralized and falling market may be evidence of failure to exercise due diligence. *Goldsmith* v. *Stiglitz, ante,* 255. Our statutory provision is but a concise statement of the well settled general rule throughout the country, as stated and discussed with citation of authorities in *Piowaty* v. *Sheldon,* 167 Mich. 218 (Ann. Cas. 1913A, 610).

The trial court carefully instructed the jury at length as to the theories and numerous adverse claims of the parties which the conflicting testimony made issues of fact.

Defendant's counsel complains that the court under the testimony as to a demoralized market "got in mind an actual theoretical perfect market based on the elementary economic principle of supply and demand being in perfect equilibrium," and wholly disregarded the fact that there was a "market price" for sugar which was the only basis for measuring plaintiffs'

damages.    Taken in its entirety we are unable to so construe the charge.    It took several days to try the case.    The trial was carefully conducted by the court and able counsel representing the respective sides. The market conditions as to sugar in the city of Detroit at that time as both sides claimed them to be were put before the jury clearly by an abundance and variety of evidence.    In instructing the jury the court did not, and could not with propriety, go into all the details of the testimony, but the claims of the respective parties were fully and fairly stated and applicable rules of law contingently given as the jury might determine issues of fact pointed out, including the measure of damages.    After carefully reviewing and explaining the claims of the parties, with the questions of law for the court and issues of fact for the jury, the court again referred to the measure of damages near the close of the charge, saying in part as follows:

"I hope the questions to be submitted to you are clear.    First, was the sugar of merchantable quality? If it was, then you will find a verdict for the plaintiff, and that verdict will depend upon what the loss was, between the contract price and what the plaintiff was able, or should have been able, after using due and reasonable diligence, to obtain the best price obtainable—what the difference was between the two prices. He has stated what he sold it for.    The question is: Was that after the use of due and reasonable diligence? If it was not, then what was the market price?    What should he have sold it for?    What could he have obtained for that sugar if he had used reasonable diligence?"

After a careful examination of this record in connection with the charge viewed in its entirety we discover no prejudicial error calling for reversal.

The judgment will stand affirmed.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.