## CATE v. MICHIGAN COFFEE CO.

1. SALES—CONTRACTS—BREACH.

Where defendant contracted to purchase from plaintiffs 25 tons of Java white sugar and immediately provide a banker's guaranty of credit upon which plaintiffs could draw, defendant's failure to provide said credit constituted a breach of the contract.[1]

2. SAME—BUYER'S BREACH OF EXECUTORY CONTRACT WAIVES RIGHT TO TENDER OR NOTICE OF RESCISSION.

If tender or notice of rescission before bringing action were involved, both were waived by defendant's refusal

[1] Sales, 35 Cyc. p. 163.

to provide the credit agreed for, and its positive statement that it did not intend to accept any of the sugar in question.[2]

3. SAME—STATUTORY NOTICE OF RESCISSION NOT NECESSARY WHERE CONTRACT BREACHED.

Where defendant was guilty of a positive breach of the contract, which stopped performance, entitling plaintiffs to treat it as broken and bring action to recover damages for the breach, notice of election to rescind, required by 3 Comp. Laws 1915, § 11895, was not necessary before bringing action.[3]

Error to Wayne; Goff (John H.), J. Submitted April 30, 1924. (Docket No. 102.) Decided December 31, 1924.

Assumpsit by George B. Cate and John A. Woodward, copartners as Cate & Woodward, against the Michigan Coffee Company for breach of a contract of sale. Judgment for plaintiffs on a directed verdict. Defendant brings error. Affirmed.

*Fleming & Baird* (*Frank W. Atkinson*, of counsel), for appellant.

*Miller, Canfield, Paddock & Stone*, for appellees.

STEERE, J. In 1920, plaintiffs were a copartnership doing business as merchandise jobbers under the firm name of Cate & Woodward with their principal office and place of business in Providence, Rhode Island. Defendant was a corporation of the State of Michigan with its office and principal place of business in the city of Detroit. Previous to this transaction defendant had made purchases of merchandise from plaintiffs, including two consignments of sugar bought during the month of April while the price of that commodity was in the ascendancy, which continued until after the contract involved here was made.

---

[2]Sales, 35 Cyc. p. 584; [3]Sales, 35 Cyc. p. 585 (1926 Anno).

On May 27, 1920, negotiations between the parties resulted in a contract in writing by which plaintiffs agreed to sell defendant and defendant agreed to buy 25 long tons of Java white sugar packed in single bags, of the crop of 1920, fair average quality of the season, to be shipped from a port or ports in Java "during July/Aug. at 23½c per pound cost, freight and insurance per steamer to New York, duty paid." Among other things the contract specifically provides:

"Buyers undertake to provide on signature of this contract a bankers guarantee that the credit required under this contract will be forthcoming in due time, and also accept responsibility for the provision of all the necessary import licenses. * * *
"Buyers to open a credit with an approved bank or banker to be confirmed immediately at buyer's expense, for an amount sufficient to cover the invoice price of the shipment, together with disbursements and/or advances as per charter party, and the sellers and/or their agents are to draw under the credit in three (3) months' sight drafts, with the relative documents attached, * * * for the due payment of which drafts upon maturity, buyers to remain responsible to drawers."

In purchasing importations plaintiffs were required to make proper financial arrangements to protect the shipper or seller and assure payments for the consignments at or before delivery. While the point of origin was Java, the purchases were made in London through a large sugar brokerage house in New York named G. H. Finlay & Company, which did a business in that line of many millions of dollars a year. It inspected the consignments, was equipped with instruments for testing, employed samplers on the docks and verified its purchases as to kind, quantity and quality. About 90 days were allowed for sugar coming from ports in Java, and in making their purchases of sugar based on contracts of sale made with or for their customers that time was taken into considera-

tion. In financing purchases plaintiffs opened letters of credit with an approved New York bank and adjusted its credits with L. E. Jager, who was Finlay & Company's financial manager with many years' experience in the sugar business, both in selling and buying. He explained the method of handling foreign purchases for importation, and told of plaintiffs' buying from his company in April, 1920, two lots of Java sugar, one of 100 tons for April/May shipment and one of 300 tons for July/August shipment from Java ports. He was present when the contracts were negotiated and identified the signatures of the contracting parties. These purchases had been made by plaintiffs when, on May 27, 1920, they sold to defendant the 25 tons of Java sugar in question here, to be shipped from a port or ports in Java during July/August of that year, and defendant contracted to open a credit or provide a banker's guarantee "to be confirmed immediately," to cover invoice price, etc., authorizing plaintiffs to draw under the credit in three months sight drafts for the purpose stated. The contracts for these purchases by plaintiffs, made and financed in the spring, for future shipment from ports in Java were in evidence, and undisputed, as was also the fact that plaintiffs sold 25 tons of such sugar to defendant for July/August shipment from Java on the terms stated in their written agreement. Jager testified that the sugar to be shipped July/August came to New York on the "Djember" and he personally visited the ship to make a general inspection of the quality, seeing it on board the ship and on the dock. The ship left Java August 25th and arrived in New York October 30, 1920. The customary inspection showed the consignment of sugar was of kind and quality sold by plaintiffs to defendant.

Defendant totally failed to make the agreed provision by banker's guarantee or otherwise to cover its purchase. The acute scarcity of sugar in early part

of 1920 owing to post-war conditions with mounting prices, followed later in the season by heavy importations and a demoralized market is briefly told in *Taylor v. Goldsmith*, 228 Mich. 259, and so directly came home to all consumers of that universal food product that it may be recognized as a matter of common knowledge.    Woodward of plaintiffs' firm testified to the rapid decline of prices during July and August, said they sold 200 tons of their Java sugar to stop losses, and kept control of 100 tons to supply contracts they had entered into until August 5th, when defendant not having lived up to the terms of its contract they sold it for 14½ cents per pound, which was the market price at that time for Java white sugar as described in the contract with defendant.    Asked whether or not "since August 5, 1920, the market price of Java white sugar had been as high as the market price quoted on that day of 14½ cents a pound," he replied, "I know that the price has not reached that level since that time."    A sugar dealer named Connelly, who had been in the business 12 years and kept in daily touch with the market, testified as an expert, without contradiction, that he had never known it to reach 14 cents since that time.

Defendant having ignored its obligation to furnish the credit provided for in the contract, on August 10, 1920, plaintiffs wrote it as follows:

"Please refer to your contract covering purchase of one car Java sugar dated May 27, 1920, in which you agree to open a letter of credit in our favor covering amount of invoice price of shipment, and which we find you have not done as yet.    We must insist upon your opening this letter of credit at once, otherwise we shall be obliged to adopt legal measures to force you to live up to the conditions of this contract."

What reply if any was made to this letter does not appear, but on August 19, 1920, plaintiffs again wrote defendant:

"We are perfectly well aware of the fact that your letter of credit had expired on the first purchase of sugar made from us, but we would refer you to your signed contract dated May 27th for another car for which you have not opened a letter of credit. This sugar is now on the water and should arrive within a month, so must insist upon this letter of credit at once. Trusting you will comply with this final request and thus save legal proceedings, we are," etc.

On August 25, 1920, plaintiffs again wrote defendant as follows:

"Regarding the car of Java sugar which was intended for yourselves and upon which the letter of credit expired, would say that although we made a desperate effort to head off this car and have same returned to New York we were unable to do so and have just been advised by the railroad people that the car is very likely in Detroit now. As you are aware you have purchased a car of Java sugar from us for July/August shipment and that sugar is due in New York within a month, hence we are making you the following proposition: 'If you will take this car of sugar and send us your certified check for the amount of invoice, which we are inclosing, we will cancel the car purchased for July/August delivery.' As you can readily see the price of this car is a half cent cheaper than the car for later delivery and your accepting this car in place of the later one will save us the expense of reconsigning same."

On August 28, 1920, defendant wrote plaintiffs as follows:

"*Gentlemen:* We are in receipt of your letter and also inclosed invoice for car of Java sugar. We wish to state that we do not intend to accept any of the sugar in question. Hoping this will settle matters, we beg to remain," etc.

Defendant offered no evidence upon the trial and at close of plaintiffs' proofs both parties asked a directed verdict. Plaintiffs' testimony being undisputed the court held that defendant having breached its contract

to provide a banker's guarantee of credit, plaintiffs were entitled to recover as damages for such breach the difference between the contract price and the market price at which they thereafter sold it to minimize the loss, amounting with interest to $5,695.90, and directed a verdict therefor.

Numerous errors are assigned and authorities cited for defendant on the indicated theory that plaintiffs' action is based upon a claimed tender and refusal of the sugar in question.    It is said in the brief of counsel for the defense that "The declaration counts specially upon a tender of the sugar in July and August and refusal on the part of defendant,"—and urged that a verdict should have been directed for defendant because—

"There is no evidence of any such tender.    The sugar covered by the contract was not shipped from Java until August, and did not arrive in New York until October."

Had plaintiffs been confined by their declaration to that theory, this contention would call for more serious consideration.    But plaintiffs planted their claim of right to recover on defendant first having breached the contract as charged in the second count of their declaration, reading in part as follows:

"For that whereas, said contract provided further that said defendant immediately after the execution of said contract should open a credit with a bank or banker sufficient to cover the invoice price of the shipment of sugar and the plaintiffs herein or their agents were entitled to draw under the credit in three months sight drafts with the usual documents attached to said drafts.

"Yet the said defendant notwithstanding its contract as aforesaid, and although repeatedly requested by plaintiff so to do, steadily refused to comply with the terms of its written contract aforesaid, and refused to furnish said letter of credit, as provided in said contract aforesaid."

The contract between these parties is conceded. It is undisputed that plaintiffs had then purchased sugar corresponding with that specified in their contract, for fall delivery of sugar to be shipped from Java ports in July or August. Tender before its arrival was neither contemplated nor possible. Their executory contract contained a condition precedent requiring defendant to open a credit with an approved bank to be confirmed immediately to cover the invoice price of the sugar it had contracted for, which it not only neglected to do but when pressed by plaintiffs to perform bluntly and unequivocally replied it did not intend to accept any of the sugar in question and so sought to end the matter. If tender or notice of rescission before bringing action were involved, as defendant contends, both were waived by such refusal. That after defendant failed to perform the condition precedent on its part and breached the contract plaintiffs sold the sugar with which they intended to meet their obligation if defendant established credit for it as agreed, does not establish inability to perform on their part. The testimony is persuasive that they could, were anxious to and would have furnished the sugar contracted for, even making overtures of compromise to that end, had defendant at any time furnished the assurance of payment as agreed. As a legal proposition plaintiffs were under no obligations before defendant's condition precedent was complied with to have on hand or itself contract for the commodity named in their executory agreement. Even the nonexistence of the thing contracted for at the time of an executory contract of sale does not invalidate it. *Meyer* v. *Shapton,* 178 Mich. 417; *Dudley A. Tyng & Co.* v. *Converse,* 180 Mich. 195. When defendant complied with its preceding obligation it would then become plaintiffs' duty to have the quantity and quality of sugar required available for delivery at the time and place specified.

Defendant's final contention is that having failed to give notice of election to rescind as required by 3 Comp. Laws 1915, § 11895, plaintiffs are precluded from recovery. Defendant was guilty in this case of a positive breach of the contract which stopped performance, entitling plaintiffs to treat it as broken and bring action to recover damages for the breach. They were under no obligations for that purpose to tender complete performance. 2 Mechem on Sales, § 1091. In *Thomas Canning Co.* v. *Johnson,* 212 Mich. 243, this court applied such rule, quoting with approval from *Anvil Mining Co.* v. *Humble,* 153 U. S. 540 (14 Sup. Ct. 876), as follows:

"Whenever one party thereto is guilty of such a breach as is here attributed to the defendant, the other party is at liberty to treat the contract as broken and desist from any further effort on his part to perform; in other words, he may abandon it, and recover as damages the profits which he would have received through full performance. Such an abandonment is not technically a rescission of the contract, but is merely an acceptance of the situation which the wrongdoing of the other party has brought about."

We find no reversible error and the judgment will stand affirmed.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.