371 Mich. 516 (1963)
124 N.W.2d 878
In re MATHERS.
HATMAKER
v.
MICHIGAN CHILDREN'S AID SOCIETY.
Calendar No. 39, Docket No. 47,951. Calendar No. 38.
Supreme Court of Michigan.
Decided December 2, 1963.
*519 Franklin C. Forsythe (James O. Kelly, of counsel), for petitioner Michigan Children's Aid Society.
Martin & Martin (Walter Martin, of counsel), for mother, Pearl Jean Mathers Hatmaker.
Lawrence, Ulrich, Tripp & Barense, for appellees Mr. and Mrs. Edward Furlong.
Peter F. Cicinelli, for Martin & Martin.
*520 SMITH, J.
Preface.
This case has 2 parts. Part 1 is an appeal from an order of disposition terminating parental rights and placing the minor child in permanent custody of the court. The order was entered by the circuit court after jury trial on the issue of whether or not the mother had neglected the child. The matter was in circuit court on appeal by the mother from probate court, juvenile division.
Part 2 of the case constitutes a review of the final report of the circuit judge to this Court on the question of whether damages should be assessed against appellant's attorney for rule violations in the preparation of the appendix.
Part 1.
Paula Marie Mathers, born October 21, 1953, is a child of Pearl Jean Mathers Hatmaker, appellant. The mother was not married at the time of Paula's birth. Appellee, Michigan Children's Aid Society, a nonprofit corporation, is a licensed child welfare agency. Appellees, Mr. and Mrs. Edward Furlong, received physical custody of the child from the Society on January 3, 1955, and have maintained custody ever since. An agent of the Society filed the neglect petition in probate court. The Furlongs were permitted to intervene and participate fully.
This lawsuit has a long and tortuous history, commencing shortly after the birth of the child in 1953. Paula Marie Mathers was born in Detroit. Her mother was 22 years of age at the time, and previously had been married and divorced. The decree, which became final March 14, 1952, was awarded her on grounds of extreme cruelty and nonsupport. She was given custody of 2 small children born of the marriage.
*521 Shortly after the birth of Paula, the mother entered into a written boarding agreement with the Society by which she obligated herself to pay for the boarding care of the child. The mother also signed a medical permit for the Society to provide necessary medical care. About 4 weeks after the birth of the child, the Society placed her in a boarding home near Milan in Washtenaw county. It is undisputed that the mother never signed a release for adoption, although there is testimony tending to show that at the time she had adoptive intent.
At the close of 1953, the child was in the boarding home near Milan and the mother was out of the maternity hospital, living with her other children and a sister. During the year 1954, the mother had several contacts with Society personnel about visiting her child in the boarding home, but either as a result of Society policy or the mother's indifference, or both, the child was not visited by the mother during this time. A social worker for the Society testified that on 2 occasions when she saw the mother during the year 1954, the mother asked to see the child. The social worker claims that she telephoned the Society central office and obtained the address of the boarding home and mailed it to the mother. The mother denies having received it. Although it was considered normal practice to make a copy of such a letter, there was none in the files. However, it was admitted by the social worker that more than 1 year later a copy was "reconstructed" and placed in the files.
Without the mother's knowledge or consent, the Society placed the child in the Furlong home on January 3, 1955. At that time, there was no order terminating parental rights, nor had a neglect petition been filed. On February 1, 1955, the social worker in charge of the case went to the home of the mother to talk to her about obtaining a release *522 of the child for adoption. It is admitted that the mother did not know that the child had been placed in a private home for eventual adoption, nor was she told of this fact at that time. The mother advised the social worker that she wanted the child returned to her. This desire either was not communicated to the Society, or if it were, then not acted upon. At any rate, the child was not returned to the mother. During the visit of February 1st, the social worker found the Hatmaker home "clean and neat". Testimony of a Society witness was that "At that time the mother not only indicated that she wanted the child back, but told me her husband was agreeable to her having it back." The husband referred to is Mr. Hatmaker to whom the mother was married at some point during the spring of 1955. It should be pointed out that he is not the child's father.
On April 12, 1955, the records of the social worker indicated that the Hatmakers had retained counsel. On the following day, April 13th, the worker filed a petition in probate court for Gratiot county (where the mother had once lived) to have the child declared neglected. The petition was later dismissed upon request of the Society.
May 10, 1955, an important conference was held between personnel of the Society and its attorneys and Mr. and Mrs. Hatmaker and their attorney. Mrs. Hatmaker offered to pay the Society for the care of the child and again demanded return of the child. At the meeting, the Society asked Mrs. Hatmaker to furnish proof of her second marriage and also a statement from her physician regarding her ability to care for an additional child. Apparently, the Society sought to judge thereby whether, in its opinion, the child should be returned to the mother.
In the meantime, the Society was having difficulty with the Furlongs. They are a childless couple, *523 seeking to adopt a child through the good offices of the Society. They took the child January 3, 1955, not knowing, however, that the Society had no legal authority to proceed with the placement. The Society realized that having placed the child in an unlicensed home, it was in an untenable position. The Furlongs were told by the Society that either they must obtain a boarding home license[1] or the child would have to be returned. The Furlongs did neither. These were happenings during the summer of 1955.
On September 27, 1955, the superintendent of the Society filed a petition in the probate court for Washtenaw county, juvenile division, alleging that Paula was a neglected child "on or about, to wit, the 25th day of April, A.D. 1955." The disparity between the date of neglect and the filing date of the petition was never adequately explained. The Furlongs entered their appearance in probate court, but were later dismissed as parties on motion of the mother's attorney. The Furlongs appealed the dismissal to circuit court. While the appeal was pending, the Society filed a petition for writ of habeas corpus alleging "that the restraining of said child, Paula Marie Mathers, by Mr. and Mrs. Edward H. Furlong is illegal." The mother was also named in the proceeding. On July 24, 1956, the circuit court reversed the probate court and ordered the Furlongs retained as parties. In the same order the court held the habeas corpus proceedings in abeyance. From this order, the mother filed general appeal in this Court. The Furlongs filed a motion to dismiss appeal on the sole ground that the order appealed from was "not a final order, but is merely an interlocutory order." The appeal *524 was dismissed by this Court on that ground. The stage was then set for further proceedings below.
After full hearing on the Society's petition in probate court, an order was entered August 15, 1957, making the child a permanent ward of the court and terminating parental rights. On the same day as the probate court order, the Furlongs filed a petition to adopt the child. On the same day, the probate judge signed an order consenting to the adoption. However, the circuit court suspended the adoption order, pending outcome of this appeal.
On August 20, 1957, the mother filed an appeal to circuit court and demanded a trial by jury on the petition. Later she moved to dismiss the case prior to jury trial, contending that the petition was fatally defective and that the order of the probate court was not in accordance with law. The motion was denied without prejudice to its renewal at the close of proofs. The mother also moved in a separate motion, prior to trial, to dismiss the Furlongs as parties. The motion was denied.
At trial in circuit court during the month of April, 1958, all sides contested the matter vigorously. Some 30 witnesses testified. At the conclusion of proofs, the Furlongs, the Society, and the mother moved for a directed verdict. The mother's motion was made subject to the express reservation "that the jury shall be allowed to determine any questions of fact that the court decides are questions of fact presented by the proofs, and return a general verdict," citing Arnold v. Krug, 279 Mich 702. The court refused to direct a verdict. Numerous requests for instructions were made and granted; some were denied, including the mother's written request to submit 5 special questions to the jury. The jury returned a verdict finding the child neglected. On September 9, 1958, the circuit court entered an order of disposition affirming the order *525 of probate court, making the child a permanent ward of the court and terminating parental rights. From this order, appellant has taken general appeal.
Appellant mother contends there were numerous errors in the proceedings. She contends that the Washtenaw county probate court had no jurisdiction over the child because said child was legally a resident of Wayne county, the county of the mother's residence. Further, the mother contends that the neglect petition did not set forth facts sufficient to bring the child within jurisdiction of the court. The mother also claims that the Furlongs were not proper parties in interest, that on the jury trial it was improper to permit them to introduce evidence as to the suitability of their home and themselves as prospective parents for the child. The mother also argues that the court had no jurisdiction to compel her to submit to a physical and mental examination by a doctor appointed by the court for the purpose of having said doctor testify at the trial as a witness for the court. She complains also that the trial court erred in denying her motion for a directed verdict at the close of proofs. Certain other questions are raised about the admissibility of evidence, requests to charge, and finally whether the facts adduced support the order terminating parental rights. Both the Society and the Furlongs accept the statement of questions set forth by appellant.
Decision.
A. What is meant by "Found within the county."
The mother argues that because the child was born in Wayne county which remained the county of the mother's residence, the child's legal residence was in Wayne county and therefore the Washtenaw county probate court had no jurisdiction. The Society *526 contends on the other hand that the statutory language employed, that is, "found", is simply the law dictionary definition that "a person is said to be found within a State when actually present therein." Black's Law Dictionary (3d ed), p 808. The Society argues that the legislature is well acquainted with the use of words such as residence and domicile and that had it intended such meaning it would have clearly said so. The Furlongs answer appellant by saying that the question is not jurisdictional, but involves a question of venue, which, they say was not seasonably raised by appellant.
The statutory language reads as follows:
"Sec. 2. Except as provided herein, the juvenile division of the probate court shall have: * * *
"(b) Jurisdiction in proceedings concerning any child under 17 years of age found within the county." CLS 1956, § 712A.2 (Stat Ann 1962 Rev § 27.3178 [598.2]).
It seems clear that the legislature intended probate court to have jurisdiction over a child so described as to age and condition, et cetera, who is physically present in the county. If it had meant jurisdiction to be based upon the residence of parents, the legislature would likely have employed such terms. We agree that the word "residence" is an oft-used and perhaps well understood term. In fact, in the same section of the statute in question, the word "residence" is used in such a distinctive way as to require the conclusion that when the legislature used the word "found", it did not mean "resides", or its equivalent.[2]
*527 B. Was petition sufficient to confer jurisdiction?
The petition in question was filed by the superintendent of the Society on September 27, 1955. In part, allegations were made as follows:
"I further represent that said Paula Marie Mathers is a resident of the city of Ypsilanti in Washtenaw county and is now residing with and under the custody and control of Michigan Children's Aid Society and she was born on October 10 [sic 21], 1953.
"I further represent upon information and belief that said child, on or about, to-wit, the 25th day of April, A.D. 1955, in said county of Washtenaw is a neglected child in that she has been in boarding care of the Michigan Children's Aid Society since November 18, 1953, during which time no payment has been made for her care by natural parent or parents; that said child has not been visited by her parents during the entire time, and further that suitability of the natural mother's home is doubtful based on question of the mother's willingness and physical and emotional ability to assume care of said child."
Chapter 12A of the probate code deals with current major problems of juvenile delinquency and child neglect. It is provided, inter alia, that the juvenile division has exclusive jurisdiction in any proceedings concerning any child under 17 years found within a county:
"Sec. 2 * * * (b) (1) Whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary support, education as required by law, medical, surgical or other care necessary for his health, morals or well-being, or who is abandoned by his parents, guardian, or other custodian, or who is otherwise without proper custody or guardianship; or
*528 "(2) Whose home or environment by reason of neglect, cruelty, drunkenness, criminality or depravity on the part of the parent, guardian or custodian is an unfit place for such child to live in, or whose mother is unmarried and without adequate provision for care and support." CLS 1956, § 712A.2 (Stat Ann 1962 Rev § 27.3178 [598.2]).
The statute requires[3] that a petition "set forth plainly the facts which bring said child within the provisions" of the applicable section of the chapter, in this case, the neglect section cited above. Appellant's chief complaint, in this connection, is that the petition fails to allege that the mother was able to pay the Society for boarding care of the child. Undoubtedly, it would have been better practice to have made such allegation in the petition. The failure, however, was not fatal. The allegation that the child was neglected in that she had been placed in care of an agency such as the Society (a child placement agency) without a visit from "her parents" for over a year, and without any payment having been made by the mother, the person responsible therefor, was sufficient to give the court jurisdiction. As weighed in terms of the neglect section of the statute, the allegations of facts in the petition might have been descriptive of 1 of the several kinds of neglect covered in this section, including, among others, the abandonment and the unmarried mother provisions.
The petition meets the test in the recent case of Harmsen v. Fizzell, 351 Mich 86. Although in the cited case the lower court order was affirmed by an equally divided court, it seems clear that each opinion would approve of the petition herein in question. Justice SHARPE was critical of the petition in Harmsen because, as he wrote (p 92), "the petition does not *529 allege that the children were neglected; that the parents failed or refused to provide them necessary support; that the children were abandoned, or that the home was unfit or improper by reason of cruelty or drunkenness, criminality or depravity as required by statute." Justice EDWARDS in his opinion held that the petition recited (p 95) "ample facts under the juvenile code for a valid order assuming jurisdiction." The petition, by the mother in Harmsen, alleged that the children were beyond her control and that she was not physically well enough to cope with them; that their father was in a mental hospital, and that the children needed security which she could not give. The petition in the instant case alleged neglect, as required by Justice SHARPE, and also it alleged specific facts constituting possible neglect, as approved by the opinion of Justice EDWARDS.
C. The participation of the Furlongs.
Appellant has contended vigorously throughout these proceedings that the Furlongs were not proper parties. Appellant also contends that it was error to permit the Furlongs to introduce evidence as to suitability of their home and themselves as foster parents because, she claims, the sole issue was that of neglect. As to whether the Furlongs were proper parties, several points ought to be noted. First, the statute provides that a summons may be issued requiring persons who have the custody or control of a child to appear personally, et cetera. CL 1948, § 712A.12 (Stat Ann 1962 Rev § 27.3178 [598.12]). Although the Furlongs had only bare physical custody of the child  there was no release from the mother nor had the court terminated parental rights  it was proper for them to have been served with summons and to have appeared as parties, subject, however, to certain limitations. It was necessary *530 to have brought them within jurisdiction of the court so as to have them amenable to court order concerning the child. In re Baby Betty, 224 Mich 675.
The real question, insofar as the Furlongs are concerned, is what was the nature of their testimony and that of witnesses produced in their behalf. Over objection of appellant's counsel, 20 Furlong witnesses were presented, including the Furlongs themselves. In the trial before the jury in circuit court, these witnesses were permitted to testify to the suitability of the Furlongs as foster parents, care given by them to the child, and in the case of a medical witness, the traumatic effect of returning the child to her mother. The medical witness was permitted to testify, over objection, that as a psychiatrist he had examined the Furlongs and found them suitable prospective parents. However, the sole issue before the jury was whether the child was within the provisions of chapter 12A of the probate code by reason of the alleged neglect of the mother. Although such evidence may have been relevant to an order of disposition, it was clearly prejudicial to permit such testimony to be presented to the jury on the issue of neglect. This Court said in Fritts v. Krugh, 354 Mich 97, 115:
"It is totally inappropriate to weigh the advantages of a foster home against the home of the natural and legal parents. Their fitness as parents and the question of neglect of their children must be measured by statutory standards without reference to any particular alternative home which may be offered the children."
Although the trial judge informed the jury that there were 2 parts to the case, the part the jury had to decide, and that which the court had to decide, it is impossible to believe that the jury was not strongly influenced in its decision by the more than *531 substantial array of witnesses and testimony in support of the Furlongs as suitable adoptive parents. Within this context we note also that the trial court at the request of the Furlongs gave substantial instructions to the jury relevant to their suitability and stability, and their affection for the child. We note, too, in this context that appellees conveniently placed in juxtaposition to the Furlongs' wholesomeness, certain lapses in conduct of the child's mother, about which we shall say more.
D. Province of judge and jury in chapter 12A proceedings.
As the learned circuit judge noted in his instructions to the jury, there are 2 parts to such a trial. For the jury, the issue of fact was neglect. In the language of the statute, this requires a finding of whether or not the child is within the provisions of the chapter. The second part is the sole province of the judge. It concerns what order is to be entered upon the findings. The statute, chapter 12A, § 18, of the probate code, reads, in part, as follows:
"If the court shall find that a child, concerning whom a petition has been filed, is not within the provisions of this chapter, he shall enter an order dismissing said petition. If, however, the court shall find that a child is within the provisions of this chapter, he may enter an order of disposition which shall be appropriate for the welfare of said child and society in view of the facts so proven and ascertained, as follows:" (Thereafter follows an enumeration of possible dispositional orders.) CLS 1956, § 712A.18 (Stat Ann 1962 Rev § 27.3178 [598.18]).
Inasmuch as a jury trial is specifically authorized by the statute,[4] when a jury is employed its use is *532 limited to the conventional jury function, that of fact finding. Therefore, in construing the statute we hold that if the jury should find that a child is not within the provisions of the chapter (in this case, not neglected) then, by the language of the statute an order dismissing the petition is mandatory. If, however, the jury finds that a child is within the provisions of the chapter, then the court may enter an appropriate order of disposition, within the policy and provisions of the chapter. The chapter provides a wide range of dispositional orders, including, but not limited to, termination of parental rights.
When a jury trial is held in such proceedings, it is necessary to keep the 2 parts separate, otherwise, as here, confusion will result. The jury should only be concerned with requisite statutory proofs contained in section 2 of chapter 12A as may be invoked in a proper petition. If proofs are permitted before the jury, bearing upon what disposition ought to be made, the error is patent. Even in the usual case where the matter is tried to the court, it is better practice to keep these 2 parts procedurally separate. See Downs, Commentary on the Michigan Juvenile Code, p 55.
In making an order of disposition, a judge may find it necessary or desirable to receive additional evidence other than that required to sustain a finding that a child is within the provisions of the chapter. This is not to suggest, however, that the dispositional aspect of the case is entirely separate from the fact finding, insofar as the judge is concerned. His disposition should be made upon all the evidence. He must weigh the nature and quality of proofs on the question of neglect along with sociological, medical, and other available data, in order to make a proper disposition. All of this *533 must be viewed within the frame of reference of legislative policy.
E. Facts do not support the order.
In the case of In re Snyder, 328 Mich 277, this Court decided, as a procedural matter, that a circuit court order of disposition could be set aside if against the great weight of evidence. Likewise, in this case, the order of disposition must be set aside, not only because it is against the great weight of evidence, but also because it is not consonant with basic statutory policy emphatically enunciated by the legislature.
First, we take up the matter of legislative policy. Even without statutory guidance so manifest here, it is the policy of the law to keep children with their natural parents, where at all possible. The statute merely emphasizes that policy. Section 1, chapter 12A of the probate code, reads in part as follows:
"This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive such care, guidance and control, preferably in his own home, as will be conducive to the child's welfare and the best interest of the State and that when such child is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to the care which should have been given to him by them." CL 1948, § 712A.1 (Stat Ann 1962 Rev § 27.3178 [598.1]).
Throughout the chapter, this legislative policy is evident. It is re-emphasized perhaps most strongly in section 19, which we quote in part as follows:
"Provided, That in all cases in which the child is placed in foster care, the court shall, at intervals of not more than 6 months after the most recent order of disposition, require the county agent to submit reports based on investigation conducted by *534 his office or by a probation officer or on information submitted by a suitable public or private family service or child caring agency approved by the court, regarding the situation of the child's family and close relatives and the possibility of their re-establishing a home for the child, such reports to continue as long as the child is under the jurisdiction of the court." CLS 1956, § 712A.19 (Stat Ann 1962 Rev § 27.3178 [598.19]).
The legislature thus, in clear and unmistakable language, has affirmed the ancient policy of law and society of keeping children with their natural parents; further, if a child is temporarily removed from such custody to return it to its family whenever feasible.
Our view of the evidence shows a conclusive case for restoring the child to its mother. The record shows a mother married and divorced at an early age, left with 2 children to support. Unquestionably, she has been guilty of certain misconduct, but such misconduct does not constitute legal justification for permanently severing parental rights. When for reasons best known to them, the natural mother and father of the child did not seek to provide it a home, the natural mother did what, at the time, appeared to be best. By boarding agreement, the child was placed with the Society, apparently with eventual adoption in mind. Later, she changed her mind about the possible adoption, after re-establishing a home with a man who showed every evidence of being a considerate husband and father. Although the mother, during the year 1954, exhibited no unusual effort to see the child, the evidence is plain that the Society did not make visiting an easy undertaking, possibly in pursuit of established policies. All of the expense and grief of this litigation might have been avoided shortly after February 1, 1955, when the mother made it abundantly clear that she desired the return of her child. It is recognizable *535 that this posed an awkward situation for the Society because it had, without authority, placed the child with the Furlongs. However, the Furlongs had Paula only about 1 month when the mother made her demand. The Furlongs apparently were angry with the Society, and either upon their own determination, or upon bad advice, sought to fight for a privilege which was neither legally nor morally theirs. The Society then felt compelled to make regular its position, and thereupon a petition claiming neglect was filed. The use of neglect proceedings to circumvent the adoption code cannot be countenanced. See In re Kronjaeger, 166 Ohio St 172 (140 NE2d 773).
At the time of adjudication, the mother had long since re-established a suitable home and surroundings appropriate to her child's needs. Fritts v. Krugh, supra. See, also, People v. New York Foundling Hospital, 17 App Div 2d 122 (232 NYS2d 479). Assuming neglect was shown from the date of birth to the time alleged in the petition, this had long been erased by her conduct subsequent to this period and prior to the adjudication. During the latter period, she sought vainly the return of her child, which under the circumstances, can hardly be grounds for an order of disposition permanently severing parental rights.
How can it be said that a mother who rehabilitates herself and then wages an 8-year battle for her own flesh and blood has committed some unpardonable sin which now makes the State master of her destiny and that of her child? Even more unjust would it be for us to say that because 8 years have been necessary to litigate the matter, the door is now barred because mother and child thusly have been too long separated.
In view of the above considerations, we are constrained to reverse and remand for the entry of *536 an order of disposition placing the child in permanent custody of her natural mother. We do so with these instructions. The order is to be carried out with care, sensitivity, and reasonable promptness. Every effort shall be made to minimize the emotional impact of the child's transfer. Sensible transfer procedures should be devised, employing all necessary resources of the court.
Part 2.
This part constitutes a review of the final report and recommendations of the circuit judge in proceedings held under Court Rule No 70, § 5 (1945).[5] This portion of the case was submitted in the January term, 1963, although it, too, has a long and not illustrious history as the principal case discussed in Part 1.
After appellant filed her appendix consisting of 447 pages in the principal case in October, 1959, attorneys for the Furlongs filed a motion to dismiss the appeal, or in the alternative, refer the matter back to the circuit court for findings. The motion consisted of 68 pages. The Society followed with its own motion in February, 1960, consisting of 37 *537 pages. Both appellees claim appellant violated Court Rule No 67, § 6 (1945)[6] by failure to make a fair presentation in appellant's appendix as required by this rule. We denied the motion to dismiss and remanded to circuit court "to ascertain whether or not the submitted appendix complies with the rules relating thereto, and, if not, to recommend to this Court (a) the measures to be taken with respect thereto, (b) the periods of time during which same should be taken, particularly with reference to such extensions of time as may be reasonable under the circumstances, and (c) recommendations, should any be warranted, with respect to action by this Court under Rule No 70, § 5."
In May, 1960, we received the first recommendations from the circuit court. That court advised that it found not all of the record urged to be included in behalf of appellees would be necessary. However, it did find that appellant's "omissions in the appendix are so gross, numerous and material as to compel the finding of this court that the submitted appendix does not comply with the rules of the Supreme Court relating thereto." The circuit court rejected the idea of amending the appendix as being "burdensome and fruitless." The recommendation was made that a bill of exceptions be prepared substantially in accordance with former Court Rule No 66 (1945). It withheld recommendations as to whether any action should be taken under Court Rule No 70, § 5, until such time as this Court indicated approval of its recommendation that a bill of exceptions be required.
Appellant objected to the circuit court's recommendations that bill of exceptions be prepared. She asked that appellees be ordered to file their own appendices; and further that special permission be *538 granted for oral argument. In a brief order, filed July 1, 1960, we approved the report and recommendations of the circuit court and ordered it to proceed to a final report and recommendations. Oral argument was permitted in the January, 1963, term.
In said final report, the circuit court found actual damages and expenses of the 2 attorneys for the Society amounting to $4,954.49. As for the 2 attorneys representing the Furlongs, the amount was $8,350.03. The court said that the appendix proceeding raised serious question in the "court's mind as to the purpose or basis actuating appellant's counsel." However, the court advised that it "stops short of making the finding that appellant's counsel acted in bad faith." It suggested appellant's counsel apparently had some misunderstanding of Court Rule No 67, § 6 (1945).
As we approach a determination of this issue we are mindful of holdings in prior cases, particularly Greenough v. Greenough, 354 Mich 508; Harden v. Widovich, 361 Mich 422; and Daley v. Gruber, 362 Mich 366.[7] These and other cases have established a principle that, in applying sanctions authorized by the rule, this Court will exercise its discretion, on final review, as the totality of facts and circumstances may require.
It has often been observed that nothing surcharges a case with emotion as much as a fight over a child. Perhaps it is because each participant instinctively identifies with 1 of the emotional symbols ever present in such proceedings. Unfortunately, in this case, emotions have triggered advocacies bordering on the unethical. The hostilities fairly leap from the pages. It is a good example of how not to handle a custody case.
*539 After many hours spent going between assertions in briefs and appendices, on the 1 hand, and a voluminous record of testimony and exhibits, on the other (an effort made necessary by many sharp contradictions), it appears that there are deficiencies and defalcations on all sides. Appellant's omissions from the original appendix fall into 2 general categories: (1) large amounts of colloquy between court and counsel; and (2) substantial quantities of testimony incompetent or irrelevant in view of our decision on the merits. On the other side of the ledger, we have been somewhat less than edified by the appellees' performances. Much time and space were wasted on an item-by-item critique of appellant's statements. In some instances, proper advocacy seems to have given way to positive litigiousness. Therefore, we exercise our discretion in this manner: in view of the multi-faceted proceedings, occasioning error, culpable and otherwise, on the part of the several participants, we do not invoke the sanctions requested. Our decision is to refuse the assessment of damages and costs as to all parties.
Relief.
An order of disposition shall be entered in accordance with the holding in Part 1. The habeas corpus proceedings, held in abeyance, are dismissed. All motions inconsistent with this opinion are denied.
No costs to either party for reasons already given.
CARR, C.J., and DETHMERS and KELLY, JJ., concurred with SMITH, J.
KAVANAGH, J., concurred in result.
BLACK, J. (dissenting).
With due if difficult deference, I dissent.
*540 My Brethren in majority, carrying themselves back like the Connecticut Yankee to the darker ages of English law and customs, make to the personal prejudice of an innocent youngster an infamous idol of the discredited rule that parental "rights" reign over the best interests of the child.[1] Doing so, and deigning no explanation, such Brethren turn their backs upon 1 of the most exalted and best settled doctrines of American law. Then, not fully sated, such majority  supposedly members of a constitutionally commissioned court of errors  sits as a court of final trial and peremptory sentence of this guiltless and now 10-year-old child; a sentence that she leave now what the record shows is a good life for another life she does not know. And this last the Brethren do contrary to the factual findings and judgment of a manifestly careful probate judge, supported fully by confirmatory factual findings of a circuit court jury on appeal and the concurring opinion of 1 of Michigan's ablest and most experienced circuit judges. They do not even consult the wishes and attachments of the child, and seem not to realize that children too have rights; rights that are  or at least should be  paramount when there is a conflict thereof with parental rights. Yes, deference is difficult.
The doctrine to which I refer was announced first, in the peninsular State, when Justices COOLEY, CAMPBELL, MARSTON, and GRAVES signed and released Corrie v. Corrie, 42 Mich 509. Their discussion, of what has remained some four-score years as dependable Michigan law, opened with these words (p 510):
*541 "In contests of this kind the opinion is now nearly universal that neither of the parties has any rights that can be allowed to seriously militate against the welfare of the child. The paramount consideration is what is really demanded by its best interests."
Accompanied by an extended and thoughtful discussion, such doctrine was followed in our leading case of In re Gould, supra.[2] On the occasion of Gould this Court, proceeding toward adoption of Justice Brewer's[3] application to like facts of an old proverb ("Let well enough alone"), redeclared the Michigan version (p 670):
"The power of parental control, though recognized as a natural right and protected when properly exercised, is by no means an inalienable one. When the `right of custody' is involved between respective claimants for a child, the courts, though in the first instance recognizing prima facie rights of relationship, in the final test are not strictly bound by demands founded upon purely technical claims or naked legal rights, but may and should, in making the award, be governed by the paramount consideration of what is really demanded by the best interests of the child. Corrie v. Corrie, supra; Matter of the Heather Children, 50 Mich 261; Chapsky v. Wood, 26 Kan 650 (40 Am Rep 321); Richards v. Collins, 45 NJ Eq 283 (17 A 831, 14 Am Dec 726)."[4]
As today's majority has noted, this case is divisive properly into 2 parts. The first presents an appeal to this appellate court for adjudication of reversible error, said to have occurred in the course of a jury tried circuit court case; a case which was brought *542 to circuit on appeal from an order of the Washtenaw county probate court entered under section 18 of chapter 12A of the probate code (CL 1948 and CLS 1956, § 712A.1 et seq., as amended [Stat Ann 1962 Rev § 27.3178 (598.1) et seq.]). The second presents for disposition the vexing results of another misfortunate order directing ascertainment, by the circuit judge, (a) whether the appellant mother's then brief and appendix conformed with our appellate rules and, if not, (b) whether a punitive assessment should be levied against her or her counsel under former Court Rule No 70, § 5 (1945),[5] now GCR 1963, 816.5. These I discuss in order.
First: I deny that this Court, distinguished from the probate and circuit courts below, has either the power or duty to find, exclusively from a lifeless record of events to which witnesses testified more than 5 years ago, that the appellant mother is or is not fit  in this year 1963  for an award of custody of Susan Furlong.[6] I deny too that Susan was not shown, before either of the courts below, to be an abandoned or neglected child within meaning and purpose of said chapter 12A. Just to suggest the former is pure fatuity, and the latter is a pure question of fact which, judged by this long and bitterly contested record of testimony, no amount of wordplay can transform into a question of law justifying today's toplofty sentence of the child.
I do agree that this Court has the power and the duty, specific questions of law having been duly raised and saved, to ascertain whether the reviewed proceedings are tainted with reversible error. On *543 that agreed premise I say that, if as the Brethren aver (and the writer denies) this jury's verdict is contrary to the overwhelming weight of the adduced proof,[7] then by all that is elemental the case should be reversed for a new trial upon 1963 distinguished from 1958 proof. But I cannot agree that such question is before us, appellant having failed to raise and save it by motion for new trial. Have we not said, many times in specific paraphrase, what appears below? Let quotation speak (Boran v. New York Life Ins. Co., 274 Mich 638, 643):
"No motion for new trial was made. Therefore, on appeal, the weight of the testimony was not before us for consideration, and we may not consider it. Olshove v. Pere Marauette R. Co., 263 Mich 579; Olmstead v. Sober, 251 Mich 688; In re McCord, 243 Mich 309; Bacon v. Snashall, 238 Mich 457; Bishop v. Shurly, 237 Mich 76; Butler v. Neumann, 232 Mich 25; Kaufman v. Kaufman's Estate, 230 Mich 388; Taylor v. Goldsmith, 228 Mich 259; Truesdell v. Michigan R. Co., 225 Mich 374; Dunton v. Sweet, 210 Mich 525; Clarke v. Case, 144 Mich 148. See, also, Roger Angstman Co. v. Liggett Spring & Axle Co., 267 Mich 620, and Delta Asbestos Co., Inc., v. Sanders, 259 Mich 317."
And see, more recently, Davis v. Jermstad, 350 Mich 439, 444, 445 (per CARR, J.), quoting with approval the following from Clarke v. Case, 144 Mich 148, 150 (cited above in Boran):
"Error is also assigned on the ground that the verdict is not supported by the evidence. The proper practice is to give the trial court an opportunity on a motion for a new trial to pass upon the question raised. As the record does not show that this was done, we cannot consider it."
*544 Finally, I am unable to support the gratuitous dixit that either of these orders (referring to the probate court order and the affirming circuit court order) will, if left alone, operate to "permanently sever parental rights." That simply cannot be so, considering sections 19, 20, and 21 of said chapter 12A. The concluding sentences of said sections 20 and 21[8] read, respectively:
"If the child is placed in the permanent custody of the court, all parental rights are terminated, though such rights may be reinstated by a supplemental order of disposition."
"At any time the court may enter an order for supplemental disposition as long as the child remains under the jurisdiction of the court."
Three of the 7 then seated Brothers made due note of this, back in 1958 when Fritts v. Krugh, 354 Mich 97, 140, 141 was decided, and they did so without traverse by any 1 of the majority foursome.[9] Looking particularly at the above sections, the 3 observed that the legislature had granted to our probate courts "continuing jurisdiction to issue supplemental orders `at any time while said child is under the jurisdiction of said court,'" and then concluded:
"Perforce, there is no finality of any order when the order itself, by command of a self-incorporating statute, is made subject to the retained and continuing power of the court to `affirm, modify, or set aside' any and all such orders."
What does this power to enter  at any time  a supplemental order mean, as applied to the case before us? Well, to affirm the present orders of *545 the probate and circuit courts would impair in no way the right of this mother to seek, on up-to-date showing under said sections 20 and 21, an order for supplemental disposition. The parental rights of Mrs. Hatmaker are not permanently severed, and will not be  legally  no matter what we decide in this case. The continuing jurisdiction  under chapter 12A  of the Washtenaw county probate court will remain intact until Susan attains the age of 17 years, or unless and until it is terminated before that by judicial action under separate statute. Will someone please gainsay this, with stated reasons?
From the foregoing let us turn to Judge Breakey's order, from which this appeal was taken. As previously noted, that order affirmed what the probate court had ordered. The probate order was entered August 15, 1957. It reads:
"That the said minor child, Paula Marie Mathers, comes within the provisions of chapter 12A of the probate code of 1939, as amended, being PA 1944 (1st ex sess), No 54, as amended.
"That it is for the best interests of the minor child, Paula Marie Mathers, to make said child a permanent ward of the court, and pursuant to the provisions of section 20 of said chapter, the said child is placed in the permanent custody of the court, and all parental rights of Pearl Jean Mathers Hatmaker are hereby terminated."[10]
It is pure anathema to say that all factual findings below, consistently arrived at as they were in both courts on abundant supporting proofs, are contrary *546 to the overwhelming weight of the proof. Accordingly, and finding no reversible error in such or other regard, I would affirm what the circuit court has affirmed, subject to 1 possibly unnecessary modification dictated of abundant caution. The affirmed order should expressly declare no prejudice to the mother's statutory right to petition at any time for an order of supplemental disposition. In sum, and surely by the specific guidance of the jurisdictional provisions of chapter 12A, what happens to Susan  custodially  now and from these autumn months of 1963, should be determined on up-to-date proof submitted before the appointed court of primary as well as original jurisdiction. That court is the juvenile division below; not the detached, distant and personally uninformed Supreme Court of Michigan.
Before passing to the second division of this case some comment, concerning majority reliance upon In re Snyder, 328 Mich 277, should be made.
First I would point to Snyder's devotion to the previously mentioned principle (that the welfare of the child is paramount), and to Snyder's pronouncement of that broad rule of evidentiary inquiry which has pertinently guided juvenile divisions as well as chancellors during the past 13 years. The Court said, in Snyder (pp 282, 283):
"The best interests of the child have been the paramount consideration in habeas corpus proceedings (In re Goldinger, 207 Mich 99; In re Leu, 240 Mich 240; Liebert v. Derse, 309 Mich 495), and in chancery cases (Smith v. Ritter, 292 Mich 26; Foxall v. Foxall, 319 Mich 459) involving the custody of minors. The jurisdiction and powers of the juvenile division of the probate court are governed by chapter 12A of the probate code (People v. Tillard, 318 Mich 619), which provides that it shall be liberally construed to the end that the child will receive the *547 care, guidance and control that will be conducive to its welfare and the best interests of the State. CL 1948, § 712A.1 (Stat Ann 1949 Cum Supp § 27.3178 [598.1]). In this proceeding which was brought under section 2, subsection (a) (6)[11] of this statute, we apply similar considerations to those which govern other custody cases. The inquiry is not limited merely to whether the child is fed and clothed, but also extends to whether it is being provided proper support, education, medical and surgical care and other care necessary for its health, morals and well-being. The wholesomeness of the surroundings is a material element in determining whether the child is receiving proper care, guidance and control."
I am unable to find, Snyder considered, that any of the proof received before this jury operated other than to shed light on what was "conducive to its [Susan's] welfare and best interests of the State." But this is not all Snyder sheds for present light.
In Snyder the probate court determined that a little child not yet 2 years of age should be placed in the care of the Muskegon Children's Home. On appeal, when the child was a little over 4 years old, the Muskegon circuit court, sitting without a jury, ordered reversal of the order of the probate court. Then, on appeal to this Court, it was held that the circuit court's order was "against the great weight of the evidence" and that the cause should be remanded to the circuit court "to enter a judgment affirming the order of the probate court."
The appeal having been tried nonjury in circuit, former Court Rule No 64 (1915), (now, as modified, GCR 1963, 810) became applicable; whereas in this jury-tried case it was not and cannot be made so. Rule No 64 expressly authorized our judgment in *548 Snyder; whereas there is no rule authorizing, upon determination that a circuit court jury's verdict is contrary to overwhelming weight, an order other than for new trial.
Not that I stand for a new circuit court trial of this dually sad case; sad for a pitiable mother and sad for a presently happy child. I stand instead for affirmance, and submit the foregoing solely as proof that no one may safely accept today's majority opinion as procedural precedent. That opinion, as Josh Billings would say, ain't likely to show; again anyway.
Second: Refer now to part 2 of the majority opinion. I agree fully with the background and discussion of our ill-starred order of remand (issued February 25, 1960)[12] and the inevitable counterpart thereof (issued July 1, 1960), which background and discussion Justice SMITH has presented in the first 5 paragraphs of said part 2. I agree, too, with his conclusion that neither costs nor damages should be assessed. It seems to me, though, that if this Court is going to admonish "all sides" about the conduct of this case, that its membership should descend from the supernal mount long enough to realize, and then confess of record, the causative sin of what is now deplored. We owe to the parties, and definitely to the circuit judge upon whom the onerous burden of our said orders was cast, an open acknowledgment that the so-called appendix system of bringing cases to review here, effective as that tried and found-wanting system has been since January 2, 1957 (347 Mich xiv-xxxii), is the poison root of what has ensued in this Mather Case; also that it has turned out, upon cumulative and steadily multiplying experience with a well-meant yet impossibly visionary theory (that a proper record for printing on appeal can *549 and will be made up without immediate supervision of the trial judge), that appellant's original brief and appendix were less at fault than the system itself.
In this type of case especially it is quite impossible to prepare an appellant's appendix which cannot be the subject of honest controversy and resultant heat. The appellee invariably insists that what has been printed does not "include all parts of the record which should be considered by the Court in order to fairly judge the issues on appeal from the standpoint of both appellant and appellee."[13] The appellant just as vigorously insists that it does.[14] Sooner or later, in the good name of better judicial administration, we shall return to the 100-year tried system of settlement, by the judge who knows best, of settled bills and records. To make the prickly sackcloth more comfortable, we might then call the judicially certified record the "settled appendix."
Conclusion.
There is something inscrutably cruel about an appellate court order  signed by judges who know absolutely nothing about the involved humanities excepting as disclosed by inert print  which yanks an innocent youngster from the good home and care of good foster parents; foster parents who, for nearly 9 of the child's 10 years, have provided for her the finest of environmental upbringing; and then forces that child into the strange home and care of an unfortunate natural mother and that mother's latest mate; this time by marriage. Refraining purposely *550 from any rehash of the mother's dismal record of motherhood and personal trouble, it is enough to say, as certified to us by Judge Breakey, that Susan doesn't even know her natural mother and that Susan came to the home of the Furlongs in January of 1955, at the age of 14 months. She remains there today. And now, since we should be interested even more in the child's welfare than in the mother's legal rights, let a witness-neighbor tell the child's state as of that time (never forgetting that the jury had a right to believe the ensuing testimony and a like abundance thereof):
"I saw Sue [Paula's nickname] the first night they had gotten her in the Furlong home. I knew the first night they heard from the Michigan Children's Aid and we went right over. Mrs. Furlong called me. The first few times I saw Sue, she was so terribly shy. She acted  well more like a little frightened animal. She didn't know which way to turn, and she didn't know which one to go to. Mostly she turned to Mrs. Furlong at the first, and she would try to get behind her. We just couldn't understand it. We hadn't had that with our children. It was different than the way our children had acted. Noises had a terrible effect on her. I have never seen a child act like that either. She would start shaking and quivering and would put hands over her ears and just scream  and I've never seen that before. She is a different child now  so outgoing now and I haven't seen noise affect her now in a good 2 years I know. At first, it was quite common for her to put her hands over her ears. Mrs. Furlong treats her very good. She is so patient with Sue, and Sue reacts in the same way. Mr. Furlong is very patient and very devoted in a different way from Mrs. Furlong, though."
Looking at the "paramount" rule set forth in cases previously cited, and particularly at In re Brown, 343 Mich 69, one is led to wonder why our majority *551 perceives no cruelty in its present order, whereas in the Brown Case the Court found these facts, leading up to its holding that "It would be cruel to Roland to remove him from his present happy home." (p 77):
"In the instant case it is our judgment that the evidence clearly sustains the trial court's finding that Roland Brown would be happier and better satisfied to remain in the custody of the Cooks and thus his personal interests require that he be left in the custody of Mr. and Mrs. Cook. A careful examination of all the testimony in this case leads to the conclusion that plaintiff when he directed that Roland be placed in the hands of Mr. and Mrs. Cook for his custody, care and maintenance, did not expect to ask for the return of that custody to himself and by his words and actions at the time, and subsequent thereto, plainly gave his sister, Mrs. Cook, to understand that he was not going to demand the return to him of the custody of Roland."
Turning now to majority reliance upon Fritts v. Krugh, 354 Mich 97 (provably as will presently appear "Michigan's judicial wosbird of 1958"). Consider the ensuing record of what in the Supreme Ruler's good time ensued to protect the little Fritts children from the unbelievable error of a bare foursome, seated here 5 years ago. After release of our Fritts opinions, the probate court proceeded (despite majority affirmance of issuance of habeas corpus in favor of the petitioning natural parents) to hear and determine petitions for appointment of guardians of the 2 Fritts children. That part of the probate record,[15] not barred from public gaze by the provisions of section 11 of the adoption statute (CLS 1956, § 710.11, Stat Ann 1962 Rev § 27.3178 [551]), discloses that the Berrien county probate *552 court found (July 29, 1959), after due hearing and by separate orders entered as to each child, "that Doyle Almo Fritts, Sr., and Lileth Marie Fritts are unsuitable parents to have the custody, care and education of the said minor, Sally Ann Fritts [Doyle Almo Fritts, Jr., in the other order]." The 2 orders stand today. They portray another and subsequent reason for my refusal to recognize Fritts as worthy precedent.
Too, they prove that there is no way, no matter how much Pollyannish piety we may write into our opinions,[16] to sentence a child into exile, from the good and only home and parents that child has ever known, without sickening punishment of the pure and the innocent. I regret indeed, cases such as Fritts, Herbstman (Herbstman v. Shiftan, 363 Mich 64) and now Mathers in mind, where imperious orders issued by this Court have terrorized or are due to terrorize and cast into hopeless grief some sinless youngster or youngsters, that the Constitution has not and does not now force us personally to carry out such orders. Perhaps some of my Brothers might then perceive that they have actually marched "to pitiless conclusions under the prod of a remorseless logic which is supposed to leave them no alternative," and that even though they have deplored the sacrificial rite, they again are about to plunge the knife with averted gaze, errantly convinced that such is the inexorable bidding of their office. The phrasing is Cardozo's, not mine. See The Growth of the Law at 66. Now will one  one at least  of the sentencing Brethren volunteer to assist personally Washtenaw's hapless probate judge *553 as that judge is forced to execute today's sentence; the sentence my Brethren would have "carried out with care, sensitivity and reasonable promptness"?
Allowing no costs, I would affirm with the modification suggested above; also with instruction to the probate court that, (a) in event of filing of a statutory petition either for rehearing or for supplemental order, separate counsel be appointed  under section 17 of said chapter 12A[17]  to represent the child, and (b) that the court consult, in open court or otherwise, the wishes of the child herself. As to such instruction see Bowler v. Bowler, 351 Mich 398, 406, and the address by J. Cameron Hall, General Counsel, State Bar of Michigan, delivered August, 1963, before the juvenile court judges assembled at Ann Arbor under auspices of the Institute of Continuing Legal Education. Further and pointedly: Now that the child has become 10 years old, she without doubt is an eligible witness. See the revised judicature act, PA 1961, No 236, § 2163 (CLS 1961, § 600.2163 [Stat Ann 1962 Rev § 27A.2163]), and comment in In re Gould, 174 Mich 663 at 670, 671.
SUPPLEMENT (November 13, 1963).
The foregoing opinion was submitted to other members of the Court September 7th last. Since then, under date of October 16th, Justice SOURIS has submitted his contribution in effort to solve rightfully this appeal of a gravely important chapter 12A case; a contribution which provides the first ray of hope for an innocent child the "law" threatens imminently. It deserves serious and respectful consideration.
Justice SOURIS, concluding as I do that ample evidence was received on strength of which the jury could find, as it did, that the child was parentally *554 neglected within the statute, holds that the circuit court erred prejudicially in the admission of evidence. Upon such finding my Brother casts his vote to reverse and remand for new trial. Such is the crux of our sole disagreement.
Now if I could agree that the circuit court did err as alleged, then my vote for reversal and new trial would be cast unreservedly. But I perceive no error and move to additional comment, keeping in constant mind our traditional and self-imposed rule that judicial error, especially that of admission of allegedly inadmissible evidence, is not reversible unless "it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."[18] There is no such miscarriage here, for at least 2 separate reasons. One is that the claimed error was invited by the appellant mother. The other is that such claimed error, if error at all, was rendered harmless by express and proper jury instruction.
What, in the course of these statutory proceedings, has been the legal status of Mr. and Mrs. Furlong, the provenly faithful caretakers and actual custodians of Susan (now 10 years old) since she attained the age of 14 months? I reply that under sections 3a, 11, 12, 14, 15, 17, and 21 of said chapter 12A the Furlongs were and are legal parties in interest and that they, as well as Susan's belatedly contrite mother, were entitled as they did to present proof of that which would enable each court below to determine, not alone whether Susan was "within the provisions" of chapter 12A (§ 18), but also what "will be conducive to the child's welfare and the best interest of the State" (chapter 12A, § 1).[19]
*555 In this case the 2 questions cannot be separated. Both became clear issues of fact for the appointed trier or triers of fact. And since chapter 12A provides for a jury trial in probate (section 17) as well as in circuit (section 22), I perceive no error, and certainly no reversible error, in receipt of the evidence which was offered  before the jury  by both sides of this bitterly contested case. Indeed, in my view anyway, both courts would have been sadly remiss had they denied either of the contending parties the right to present such proof. Both courts needed all available evidentiary light upon the stated issues. Such light both received in exhaustive detail. In sum, and since this Court by the Snyder Case (In re Snyder, 328 Mich 277, at 282) has expressly read into chapter 12A the general, latitudinous and overriding requirement of judicial care for the best interests of the involved child, it seems to me that the scope of the evidentiary inquiry is automatically broadened once there is proof of parental neglect or continued parental unconcern for the child and its welfare. And in this case there was such proof; proof which seems to have persuaded a probate judge, a circuit court jury, and a finally reviewing circuit judge.
Now if it is to be held that receipt of the Furlong proof was judicial error, I would point to the fact that the respective contenders  the Hatmakers and the Furlongs  visibly invited such error in standoff fashion. Each sought, by proof of events and occurrences subsequent to January 3, 1955 (the date on which the child came to Furlong custody), to establish environmental and personal developments favorable to their competitive contentions. And what was done in such regard was sanctioned below upon the integrity of the Snyder Case.[20] I cannot *556 in these circumstances join in pronouncing their evidentiary rulings as prejudicially reversible, especially in view of Judge Breakey's carefully restrictive jury instructions. He told the jury:
"While the record shows that Mr. and Mrs. Edward Furlong will be good parents to provide a home for Paula, I charge you that that is not for your consideration in this suit. I charge you, members of the jury, that the question to be decided is whether Paula was a neglected child as alleged by the agency in its petition. * * *
"You are the sole triers of the fact on the 1 issue which I am presenting to you, and in that, you may take into consideration the entire testimony as it has to do with what the mother did for the child or what the mother did not do for the child in determining whether or not there was neglect, whether or not the child was a neglected child. * * *
"The verdicts in the case that may possibly be given are two: (1) That Paula Marie Mathers was a neglected child. (2) That Paula Marie Mathers was not a neglected child. The period of the claimed neglect is from the time of her birth to the date of the filing of the petition, which was September 27, 1955, I think."
But aside from all this I return to what was written initially and above for affirmance. This statutory appeal to circuit, unlike just about all cases that are tried before juries in circuit, ended legally with no prejudice to the mother's right to re-enter the probate court with up-to-date proof disclosing, *557 if it should so disclose, that she is entitled to a supplemental order of disposition. It is best for her, the child too as I conceive, that further litigation should proceed in the probate court, in the manner authorized by section 20 of said chapter 12A. The pending adoption proceedings will have to be remanded to that court anyway, and that court should be enabled  promptly  to go about all needful determinations on present day proofs.
To recapitulate: When this Court assumes to appraise an allegation of reversible error, said to have occurred during trial of a chapter 12A case involving the alleged neglect or abandonment of a child, our membership should bear in mind that the admissible inquiry is necessarily broad; simply because the statutory purpose is declared to be broad. The concluding paragraph of section 1 (CL 1948, § 712A.1 [Stat Ann 1962 Rev § 27.3178 (598.1)]) reads:
"This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive such care, guidance and control, preferably in his own home, as will be conducive to the child's welfare and the best interest of the State and that when such child is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to the care which should have been given to him by them."
As for the statutory preference ("in her own home"), that extends no aid to the appellant mother. This child never had or knew a home of her own, at least until she was brought to the household of the Furlongs. She has never known a "home" with her mother, and there is no such "home" available now excepting that of the Hatmakers.[21] Which is to say simply that the 2 judges below could not have performed their mandated duties under chapter 12A *558 without full evidentiary inquiry. Each saw to it that the issues were tried fairly, and that in my view dictates affirmance rather than reversal.
Finally, I would say this: If a majority of the Court is inclined to reverse and remand for new trial, rather than order precipitate transfer of the child from the Furlongs to the Hatmakers, I have no implacable objection to such a judgment and would join for the sake of comparably better disposition of an appeal, the ultimate result of which may stultify forever a trusting and innocent young life. After all, hundreds of similar chapter 12A cases come every year to the responsibility of our 83 probate and circuit jurisdictions, cases of which this Court knows naught and never will, and we might as well settle 1 thing at least for such jurisdictions, that is, when a like chapter 12A appeal is jury tried in circuit, a judicial holding that the jury's verdict is contrary to overwhelming weight calls for a new trial; not a peremptory order of disposition.
SOURIS, J. (dissenting).
The history of this tragic controversy over the custody of a child is a history of continuing failure to observe procedural safeguards against precipitous disruption of parental relationships. It began in January of 1955 when the Michigan Children's Aid Society inexplicably placed the Mathers infant with the Furlongs for adoption before the agency had obtained the natural mother's written release of the child and consent to its adoption. Almost 9 years later, it is about to end with our declaration that the circuit judge disregarded procedural safeguards in failing to restrict the jury's consideration to the single issue of the mother's alleged neglect of the child. But at the very moment of our appellate declaration, it is proposed that we ourselves disregard procedural safeguards by treating "as if" it were valid the very jury finding of neglect claimed (properly, in my view) to have been prejudicially influenced by irrelevant evidence and by summarily ordering the now 10-year-old child's return to her natural mother whom she has never known without first requiring so much as a current testimonial record of the mother's current suitability for such custodial entrustment.
I cannot conceive how we can render justice to this child by basing our judgment of her best welfare on an appellate record made in the trial court half her lifetime ago. Nor can I conceive how we can expect adherence by our trial judges to procedural requirements designed to safeguard fundamental rights of parties when we ourselves, while acknowledging their existence, disregard them in this admittedly difficult case.
Mr. Justice SMITH finds that the circuit court jury's verdict that *559 the appellant mother was guilty of statutory parental neglect was poisoned by the trial court's prejudicially erroneous admission of irrelevant evidence designed for jury conviction that the foster parents were more suitable as custodians of the child than the child's own mother. While recognizing that in such proceedings when tried to a jury, the judge's obligation to determine what should be done with the child arises only after a valid jury finding of parental neglect, and notwithstanding his determination that this jury's finding of such neglect was prejudiced by the erroneously admitted evidence, Justice SMITH does not order a remand for proper jury retrial of the neglect issue nor does he dismiss the proceedings for absence of a valid finding of such neglect. Instead, he proceeds by appellate court assumption of that duty of the trial judge which arises normally only when the fact of parental neglect has been first validly established,  the duty he assumes for this Court being determination of custodial disposition of the child as provided by section 18 of chapter 12A of the probate code.[1] He determines that the evidence presents "a conclusive case for restoring the child to its mother", and so orders on this appellate review of a 5-year-old record of neglect proceedings,  not because of failure to prove statutory neglect,[2] be it repeated, but, rather, because the mother's "misconduct does not constitute legal justification for permanently severing parental rights", the mother's subsequent rehabilitation and our statutory and public policy favoring natural parents in child custody disputes considered.
The jury's verdict, made as it was in a judicial contest between the Hatmakers and the Furlongs for the jury's favor as the more suitable custodian of the child prize, rather than in the context of judicial inquiry into the sole fact of asserted parental neglect, should not be allowed to stand in this case nor should jury exposure to such irrelevant evidence be countenanced judicially in any future similar case. Absent a valid finding of neglect in such cases, there is no basis in the statute or in case law for judicial termination, temporarily or permanently, of parental rights. Hence, Judge Breakey's order of custodial disposition should be set aside.
However, this Court has no greater powers than the trial court absent a valid prior determination of parental neglect. This Court can no more validly determine, at this stage in this proceeding and on this stale record, that custody of the child should be forthwith "restored" to her mother, as does Justice SMITH, than could Judge Breakey validly determine that the mother's parental rights be terminated. I would not deny that under these circumstances the trial court and, in turn, this Court could dismiss all proceedings herein, thereby leaving the Hatmakers and the Furlongs as potential contestants in habeas corpus proceedings; but no one has so suggested, nor do I.
It seems to me that orderly judicial procedure in this case (and in future cases to the extent that what we here say may determine the course such cases take in the future) requires reversal of the jury's verdict of neglect and of Judge Breakey's order and remand of the cause for retrial before another jury of the statutory parental neglect *560 issue,  this time unfettered by irrelevant evidence such as the Furlongs' superior suitability as parents and by equally irrelevant evidence of Mrs. Hatmaker's alleged immorality prior to the birth of the child whose custody is contested. Judicial inquiry into such matters (the Furlongs' suitability as parents and Mrs. Hatmaker's past and present state of morality) should be undertaken only in the event the jury first returns a proper finding that Mrs. Hatmaker's conduct after the birth of her child in October of 1953 and prior to commencement of this proceeding constituted parental neglect within the meaning of section 2, subd (b)(1) of chapter 12A of the probate code.[3]
When and if such inquiry is required by a valid jury finding of parental neglect, then, of course, the welfare of the child must be the paramount judicial concern. In these cases, until the parents are found to have forfeited what we have called (In re Gould, 174 Mich 663) the "natural right" to control and custody of their child, by judge or jury finding of neglect or abandonment, there is no occasion for judicial consideration of the child's best interests by which in these cases is meant the custodial disposition considered best for the child from among those practicably available. Until such finding validly is made, of parental neglect, in cases brought under section 2, subd (b) (1), judicial officers have neither the obligation nor the power to deprive parents of custody of their child. So says our legislature in section 18 of chapter 12A. In this respect proceedings under this chapter of the probate code differ from proceedings in habeas corpus where custody of children is the issue between contesting parties, one of whom claims the right to custody based upon technical legal rights and the other of whom claims custody on the basis of present possession. Such cases abound in large numbers in our reports (Matter of the Heather Children, 50 Mich 261; In re Stockman, 71 Mich 180; Greene v. Walker, 227 Mich 672, and cases cited therein at pp 677, 678; In re Seeney, 330 Mich 55; In re Brown, 343 Mich 69) and in such cases it is quite appropriate to say, as we did In re Gould, supra, 670, that the courts must be governed "by the paramount consideration of what is really demanded by the best interests of the child", leaving for subsequent judicial determination questions of guardianship or adoption.
I would reverse and remand for retrial before judge and jury of the distinctive and separable, but dependent, issues of parental neglect and custodial disposition. I concur in part 2 of Justice SMITH'S opinion.
O'HARA, J., took no part in the decision of this case.

ON APPLICATION FOR REHEARING.
BLACK, J. (dissenting from denial of rehearing).
Of all closely divisive decisions handed down in recent years, this one should be reheard by a Court which, for the first time since 1954, is not due for regular changes of its personnel.
Two months ago 5 members of the Court  their ranks reduced now to 4 by the retirement of former Justice CARR  signed Justice SMITH'S order for transfer, of this fatherless and defenseless youngster, from what the record shows is a fine home and praiseworthy environment, to an uncharted life with people the youngster doesn't even know. That was done upon sole strength of controversial testimony given *561 more than 5 years ago. It was done without knowledge on the part of any judge of any court that the home and the personal company to which that order sends the youngster are environmentally proper today, distinguished from the disputed circumstances shown back in April of 1958. No judge  not any judge of a Michigan court  knows today where the child is to be taken by Justice SMITH'S order. No judge of any Michigan court has even seen the child's real mother and that mother's latest mate since the spring of 1958, and they are the custodians Justice SMITH and his votaries have selected  undeniably in utter blindness  for 10-year-old Susan Furlong.
It is incredible, to me, that any judge would hesitate to support an order bringing the critical record up to date by means of a new probate proceeding or new trial in circuit, if for no other reason than to avoid the possibility, if not probability, of a ghastly judicial mistake occasioned by an outrageous nunc order too long pro tunc. One need but add that Susan is not quite old enough, in this year 1964, to understand the denial to her, by today's "thumbs down" quartette, of what for even the meanest of our citizens is constitutional due process of law. Some day, though, if she lives through forthcoming weeks and months of shame and grief thus visited upon her, she will be able to read in our reports the reasons  whatever their worth  that seemingly prompt my errant Brethren. Will she then believe in what we call "courts of justice"?
Of the presently seated Court 3 members stand for rehearing. Four others say nay. One "passes," thus casting his "neutral" vote with the sentencers. No one of the 4 will yield, even though the future of an innocent and trusting child is at stake upon such division.[1] Yet 3 present members, thus standing pat, did not hesitate to join the writer in voting to rehear ordinary damage actions like Perin v. Peuler, 369 Mich 242, rehearing ordered June 4, 1963; and 2 such present members did not hesitate to join in granting rehearing of Steger v. Blanchard, 350 Mich 579, reheard and redecided 353 Mich 140; and Weller v. Mancha, 351 Mich 50, reheard and redecided 353 Mich 189. Strange business, this. Suits to recover money seem more important, and more susceptible of reconsideration upon rehearing, than are proceedings the outcome of which may and probably will blight the life of a child already terror-troubled by what this Court ordered last December.
I would rehear especially on account of new legal questions; questions raised properly on present application since they were gratuitously decided by the Court without opportunity of brief and argument thereon.
The first of such questions is whether, upon judicial determination that the child "is not within the provisions of this chapter" (section 18 of chapter 12A [CLS 1956, § 712A.18; Stat Ann 1962 Rev § 27.3178 (598.18)], as amended by PA 1963, No 65), the probate court or any court in turn may with constitutional sanction go beyond the statutory directive (dismissal of the pending petition) and, without further statutory proceedings, enter "an order of disposition."
The second of such questions is whether, the verdict and judgment below having been majority-held contrary to the great weight of the evidence, but not held contrary to law as on motion for directed *562 verdict, the Court's order of disposition violates the constitutional right of appellees to a jury trial and a jury's verdict. To the point see Hintz v. Michigan Central R. Co., 132 Mich 305, 307.
The third of such questions is whether, the premises of foregoing questions 1 and 2 considered, this Court's custodial order denies to appellees  also that beleaguered youngster  due process of law.
These are serious questions.[2] Under the practice as it stood between 1851 and 1963 (CL 1857, § 3385; CL 1948, § 601.11 [Stat Ann § 27.31]) this Court would not have proceeded to final decision without providing the "opportunity to argue the same before the court." I think we should continue to follow that practice and register accordingly these views in opposition to denial of rehearing.
This child's case, in irrefutable sum, deserves on application for rehearing something more than the usual and casual lick and stamp of denial. For elaboration the profession is referred to forthcoming opinions in In re Ernst, a minor, submitted during the October term.
NOTES
[1] See CL 1948 and CLS 1956, § 722.101 et seq. (Stat Ann 1957 Rev § 25.358[1] et seq.).  REPORTER.
[2] "(d) * * * If any child is brought before the juvenile division of the probate court in a county other than that in which said child resides, said court may enter an order prior to hearing transferring the jurisdiction of such matter to the court of the county of residence, * * * with the consent of the judge of probate of said county of residence." CLS 1956, § 712A.2 (Stat Ann 1962 Rev § 27.3178 [598.2]).
[3] CL 1948, § 712A.11 (Stat Ann 1962 Rev § 27.3178[598.11]).  REPORTER.
[4] CL 1948, § 712A.17 (Stat Ann 1962 Rev § 27.3178[598.17]).  REPORTER.
[5] See 347 Mich xxx, or Honigman, Michigan Court Rules Annotated, 1959 Pocket Part, p 212.

"Sec. 5. The Court may, upon its own motion, or the motion of any party, dismiss an appeal, assess punitive damages or take other disciplinary action when it has been determined that an appeal or any of the proceedings therein was vexatious by reason:
"(a) That the appeal was taken for purposes of hindrance or delay or without any reasonable basis for belief that there was a meritorious issue to be determined on appeal; or
"(b) That any motion, argument, petition, brief or appendix filed in the cause was grossly lacking in the requirements of propriety or grossly disregarded the requirements of a fair presentation of the issues to the Court.
"Punitive damages as herein provided shall not exceed an amount equivalent to actual damages and expense incurred by the opposing party, including reasonable attorney's fees, and an added amount not exceeding 10% of any judgment for money damages awarded in the lower court or tribunal."
[6] See 347 Mich xxii, 355 Mich xiv, and Honigman, Michigan Court Rules Annotated, 1959 Pocket Part, p 195.
[7] See valuable summary of cases in 38 University of Detroit Law Journal p 343.
[1] For American repudiation of such rule, and the record of installation of our enlightened rule that the welfare of the child is always paramount, see In re Gould, 174 Mich 663, 669, 670, and the exhaustive discussion in 39 Am Jur, Parent and Child, §§ 18-20, pp 604-609. Parens patriae, not patria potestas, is the universal rule in this country.
[2] It has been repeated many times since. See, inter alia, In re Stockman, 71 Mich 180; Greene v. Walker, 227 Mich 672, 678; Sawyer v. Sawyer, 312 Mich 524; Johnson v. Johnson, 318 Mich 21; In re Seeney, 330 Mich 55; In re Brown, 343 Mich 69.
[3] The writer of Chapsky v. Wood, cited in quotation. See p 672 of Gould, p 656 of Chapsky.  REPORTER.
[4] Richards v. Collins actually is reported in 14 Am St Rep 726. The Court's reference to American Decisions was error.
[5] See 347 Mich xxx, or Honigman, Michigan Court Rules Annotated, 1959 Pocket Part, p 212.
[6] This is the only name the little girl knows, or is known by, or answers to. At age 10, how is she to comprehend, and then explain to herself and others, that she is fatherless Paula Mathers? Susan she is in this record, and Susan she will remain throughout this opinion. The detent of our ruthless guillotine has not as yet been tripped above a trusting unsuspecter, Susan Furlong.
[7] That is the test on review of a jury tried case when the question is duly raised. See Schneider v. Pomerville, 348 Mich 49, 53-55, citing earlier Michigan cases.
[8] CL 1948, § 712A.20 (Stat Ann 1962 Rev § 27.3178 [598.20]), and CL 1948, § 712A.21, as amended by PA 1958, No 129 (Stat Ann 1962 Rev § 27.3178 [598.21]).  REPORTER.
[9] See discussion of Fritts, relating the fortuitously fortunate outcome thereof, later in this opinion.
[10] The following advices are gratuitous. It is not out of the way, however, to suggest to probate judges that the wording of every order, entered under the final sentence of said section 20, should conclude in the language of the section, that is, by adding the words "though such rights may be reinstated by a supplemental order of disposition." The chapter effects such an adjudicatory result anyway, and it is best to avoid legal as well as lay misunderstanding of such orders that they spell out, for all to read, the statutory qualification whenever the judge decides to place a child "in the permanent custody of the court."
[11] Subsequent amendments have placed this and additional material in subsection (b) (1) (2) of the act. See CLS 1956, § 712A.2 (Stat Ann 1962 Rev § 27.3178[598.2]).  REPORTER.
[12] For quotation of such order, see part 2 of Justice SMITH'S opinion.
[13] The quotation is from the 1959 amendment to Court Rule No 67, § 6. See 355 Mich xiv.  REPORTER.
[14] For melancholy example, consider the case before us. Appellant's original appendix, filed October 26, 1959, consisted of 447 pages. Now, after intervening months of wrangling on remand, the total pagination of all appendices numbers 1870!
[15] Upon request of the undersigned such part of the record has been certified to our clerk, to become a part of the Fritts Case file here.
[16] Say as in Fritts at 117, "with the purpose of occasioning as little damage as possible in the lives of there children", and now in Mathers by directing every effort "to minimize the emotional impact of the child's transfer."

This stuff takes the fur lined lawbook. A judge might with equal effect order that death be "minimized."
[17] CLS 1956, § 712A.17 (Stat Ann 1962 Rev § 27.3178[598.17]).  REPORTER.
[18] CL 1948, § 650.28 (Stat Ann 1943 Rev § 27.2618). For the current rule, headed "Harmless Error," see GCR 1963, 529.1.
[19] For sections mentioned see CL 1948, § 712A.1 et seq., as amended (Stat Ann 1962 Rev § 27.3178[598.1] et seq.).  REPORTER.
[20] The Snyder Case led the circuit judge to view the purpose of the statute as I do. After having quoted from the Snyder Case he found:

"The court is impressed by the fact that in the only case brought to the court's attention, on which both parties rely in part. In re Snyder, 328 Mich 277, although the procedural facts were different, the adopting parents were permitted to intervene, which tends to support this court's present ruling.
"The court further finds that in view of the latitude indicated in the various sections of the probate code and in the Snyder Case the jurisdictional power of the probate court should be liberally construed and this court considers it to be for the best interests and welfare of said child that the Furlongs be admitted as parties so all pertinent matters may be determined."
[21] "Now" means, of course, the situation as it was disclosed in 1958, when the case was tried in circuit.
[1] CLS 1956, § 712A.18 (Stat Ann 1962 Rev § 27.3178[598.18]).
[2] There was sufficient evidence before the jury to support a finding that the child's mother neglected or abandoned her within the meaning of section 2, subd (b) of chapter 12A. Had the jury reached such conclusion on a record free from prejudicially irrelevant evidence, this Court would be obliged to acknowledge its validity.
[3] CLS 1956, § 712A.2 (Stat Ann 1962 Rev § 27.3178[598.2]).
[1] Dante tells us that Divine Justice weighs the sins of the warm hearted, and the sins of the cold blooded, in separate scales; also that the hottest places in hell are reserved for those who, in crisis, maintain neutrality.
[2] They give rise at once to additional question whether Justice SMITH'S order is binding upon the youngster, speaking up as she yet may through guardian or next friend. She, so far, unlike the nationally nurtured adult charged with felony or capital crime, has not been provided with "the assistance of counsel for his [her] defense."