IN THE MATTER OF DRAPER

Docket No. 85064. Submitted December 11, 1985, at Lansing.—Decided April 9, 1986. Leave to appeal applied for.

The Lenawee Probate Court, Robert J. Baker, J., terminated James Draper's parental rights in his daughters Nicole and Stacy Draper on grounds of neglect. James Draper appealed. *Held:*

Judge Baker exceeded his authority when he terminated Mr. Draper's parental rights on grounds of neglect. There was very little evidence, certainly not clear and convincing evidence, of neglect. The order terminating Mr. Draper's parental rights is reversed and the case is remanded to the probate court whereupon the court shall, without delay, return the children to the custody of their father.

Reversed and remanded.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — COURT RULES.

Parental rights cannot be terminated unless the state proves by clear and convincing evidence that such termination is warranted (MCR 5.908[C][2]).

2. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — APPEAL.

A probate judge's findings in proceedings to terminate parental rights are reviewed under the clearly erroneous standard.

3. PARENT AND CHILD — REMOVAL OF CHILD FROM PARENTS — CUSTODY ORDERS.

The court in any case in which custody of a child is removed from the parents must state in the order for disposition or any supplemental order of disposition whether the child is placed in the temporary or permanent custody of the court (MCL 712A.20; MSA 27.3178[598.20]).

REFERENCES

Am Jur 2d, Parent and Child §§ 5, 8-45.

Validity of state statute providing for termination of parental rights. 22 ALR4th 774.

Standing of foster parent to seek termination of rights of foster child's natural parents. 21 ALR4th 535.

4. PARENT AND CHILD — NEGLECT — REMOVAL OF CHILD FROM PARENTS — PERMANENT CUSTODY.

Entry of an order taking permanent custody of a child due to neglect by the parent must be based upon testimony of such a nature as to establish or seriously threaten neglect of the child for the long run future.

5. COURTS — PROBATE COURTS — ORDERS AFFECTING ADULTS.

A probate court may make orders affecting adults as in the opinion of the court are necessary for the physical, mental, or moral well-being of a particular child or children under its jurisdiction; such orders are incidental to the jurisdiction of the court over the children (MCL 712A.6; MSA 27.3178[598.6]).

6. PARENT AND CHILD — NEGLECT — TERMINATION OF PARENTAL RIGHTS — PARENTING CLASSES.

The failure of a parent to attend parenting classes does not establish the neglect necessary to warrant termination of parental rights over his or her child unless such classes were actually needed to improve neglectful behavior by the parent.

7. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS.

Parental rights cannot be terminated for failure to abide by a court order.

8. PARENT AND CHILD — NEGLECT.

There must be some act or omission that is blameworthy on the part of a parent in order for there to be a finding that the parent is guilty of neglect toward his or her child.

9. PARENT AND CHILD — NEGLECT — TERMINATION OF PARENTAL RIGHTS.

There must first be clear and convincing evidence of neglect before the best interests of the children may be considered in a proceeding to terminate parental rights.

10. PARENT AND CHILD — NEGLECT — TERMINATION OF PARENTAL RIGHTS — ALTERNATIVE HOMES.

The suitability of an alternative home is an improper consideration in a proceeding to terminate parental rights until statutory neglect has first been established.

*Stephen W. Oram,* for Stacy and Nicole Draper.

*Hammond, Baker, Kralick & Fraile* (by *Robert J. Fraile),* for respondent.

Before: D. E. HOLBROOK, JR., P.J., and T. M. BURNS and HOOD, JJ.

PER CURIAM. Respondent James Draper appeals as of right from a probate court order terminating his parental rights in his daughters Nicole and Stacy. We reverse.

Nicole and Stacy were born to James Draper and Beverly Draper (now Tripp) in 1972 and 1974 respectively. James and Beverly were divorced in 1977 and custody of the girls was awarded to Beverly. Beverly then married Jeffrey Tripp. James married Linda Draper in 1979. James and Linda had two of their own children and also had custody of Linda's son Jeffrey.

On March 30, 1979, the Department of Social Services filed a petition in the Lenawee County Probate Court alleging that Beverly's husband physically abused Nicole and Stacy. The probate court determined the allegations to be true and entered an order of disposition placing the girls in foster care. At about the same time, James Draper was criminally charged with physical cruelty to his stepson Jeffrey. On December 31, 1979, he was convicted of the charge and sentenced to prison. He was paroled in April of 1981. On September 11, 1981, Beverly Draper Tripp voluntarily relinquished her parental rights in Nicole and Stacy. The understanding between the parties and the court was that the girls were to remain in foster care pending rehabilitation of James Draper's parenting skills, with the expectation that Nicole and Stacy would eventually be returned to his custody.

On June 20, 1982, Nicole and Stacy were placed in James Draper's physical custody at his home in the Upper Peninsula. However, in October of 1982, the girls were again placed in foster care. They were originally placed in a home near James

Draper in Houghton County, but in November of 1982 they were placed in a foster home in Lenawee County, at the extreme opposite end of the state.

On January 27, 1984, a hearing was held to determine whether James Draper's parental rights should be permanently terminated based upon allegations that Draper had physically abused his daughters when they were in his custody and that he had emotionally neglected then by failing to maintain regular contact with them. At the conclusion of the proofs, the probate judge who had presided over the case during all proceedings in Lenawee County held that the children should not be placed in the permanent custody of the court and, thus, that Draper's parental rights should not be terminated. The judge held that the proofs failed to establish the alleged repeated abuse of Nicole and Stacy, since one spanking of Nicole and two of Stacy was not sufficient evidence of abuse. Moreover, the judge found that the only evidence of Draper's inability to maintain a home was during his now-ended period of incarceration and that the reason the girls had not been home was because the DSS would not let them go. In response to psychiatric testimony that the parental bond between Draper and his daughters was poor or nonexistent, the judge found that the circumstances did not show neglect and that the court could not terminate parental rights solely on the basis of a lack of parental bond. The court then also scheduled an additional dispositional hearing to determine whether the girls should be returned to Draper's custody. At that hearing, the judge decided that the girls should not be placed immediately into Draper's custody, but indicated to him that he was aware that the girls were frightened of Draper and that he intended to gradually rein-

troduce the family members to each other. At a subsequent rehearing on June 25, 1984, a dispositional order placed the girls back in the Draper home. A similar order was entered after a rehearing on August 27, 1984. The court order required the Drapers to keep appointments for counseling and therapy, to take the children to scheduled appointments and to cooperate in treatment programs for the children.

In January, 1985, the children were removed from the Draper home because of allegations of physical abuse. On January 11, 1985, a petition was filed which contained allegations of physical abuse and emotional neglect by the Drapers. While it was not explicit, the document apparently was filed in an attempt to obtain a hearing during which evidence could be offered in support of the allegations in order to terminate respondents' parental rights. The specific allegations of the petition were that:

"On or about 1/5/85, Linda Draper struck Nicole Maxine Draper with a stick several times, causing a 2 × 6″ bruise to the left hip-buttock.

"On or about 1/10/85, Linda Draper stated she would shoot the children, Mr. Draper and Beth Selke, Protective Services Worker, if anyone tried to remove her children.

"James and Linda Draper fail to meet the emotional needs of Nicole Maxine and Stacy Marie Draper:

"A) Refuse to sign a contract with Family and Children's Services of the Upper Peninsula outlining specific goals towards improved parenting and family relationships.

"B) Failed to follow through on a referral to Operation Friendship.

"C) Linda Draper, Step-mother, attended four of eight Step Parent group sessions; neither James nor Linda Draper engaged in much interaction with the group.

"D) James and Linda Draper did not attend Parenting Classes offered to them during the summer of 1984.

"James Draper knew or should have known of the physical and emotional abuse of Nichole and Stacy Draper and failed to protect his children from this abuse."

On January 21, 1985, a brief hearing occurred at which the judge admonished Draper's failure to install a telephone in his home and attend "Operation Friendship", suggestions which had been made by the DSS. The court also admonished respondent regarding his alleged failure to make arrangements to attend parenting classes and regarding problems he was having getting his second wife to cooperate. The court stated that Nicole and Stacy wanted to return to their natural mother and that the girls' foster parents wanted to adopt them. The judge urged Draper to voluntarily relinquish his parental rights. He did not.

On May 3, 1985, a hearing was commenced to determine whether respondent's parental rights should be terminated. Because the probate judge who had previously presided over the case retired, a new probate court judge presided over the hearing. At the conclusion of the testimony, the second judge terminated respondent's parental rights. We find that he erred in doing so.

Due process, as well as MCR 5.908(C)(2), requires that parental rights not be terminated unless the state proves by clear and convincing evidence that such termination is warranted. *In the Matter of Hinson,* 135 Mich App 472, 475; 354 NW2d 794 (1984), a probate judge's findings in proceedings to terminate parental rights are reviewed under the clearly erroneous standard. *In re Cornet,* 422 Mich 274; 373 NW2d 536 (1985). An order terminating parental rights under the juvenile code may not be

entered unless the court makes findings of facts, states conclusions of law, and includes the statutory basis for the order. MCR 5.914.

In his May 13, 1985, order, the second judge indicated that respondent's parental rights had been terminated pursuant to subsections (e) and (f) of MCL 712A.19a; MSA 27.3178(598.19a). The relevant statutory language provides:

"Where a child remains in foster care in the temporary custody of the court following the initial hearing provided by section 19, the court may make a final determination and order placing the child in the permanent custody of the court, if it finds any of the following:

\* \* \*

"(e) The parent or guardian is unable to provide a fit home for the child by reason of neglect.

"(f) The child has been in foster care in the temporary custody of the court on the basis of a neglect petition for a period of at least 2 years and upon rehearing the parents fail to establish a reasonable probability that they will be able to reestablish a proper home for the child within the following 12 months."

The initial hearing provided by § 19 which is referred to above is a rehearing which is to take place not more than six months after entry of an order of disposition which places a child in foster care. At that hearing, the parents of the child must appear. They are required to show efforts made by them to reestablish a home for the child. Section 19 also provides for further follow-up hearings.

In this case, the judge exceeded his authority when he terminated respondent's parental rights. Under § 19a, the court may make a final determination and order placing a child in the permanent custody of the court only "[w]here a child remains

in foster care in the temporary custody of the court following the initial hearing provided by section 19". Neither child in this case had remained in foster care in the temporary custody of the court. Rather, the children had been placed back into respondent's custody at his home. We note that the June 25, 1984, and August 27, 1984, court orders contained improper and somewhat contradictory wording. The orders indicated that the children were to "remain Temporary Wards of the Court" while at the same time indicating that the children were to be "placed in the home of James Draper" under the supervision of the DSS. Section 18 of the juvenile code, MCL 712A.18; MSA 27.3178(598.18), provides a list of numerous orders of disposition which may be entered by the probate court if appropriate for the welfare of the child and society in view of the facts proven and ascertained. Such orders may be amended or supplemented as long as a child remains under the jurisdiction of the court. MCL 712A.19; MSA 27.3178(598.19). In all cases in which custody of a child is removed from the parents, the court must state in the order for disposition or any supplemental order of disposition whether the child is placed in the "temporary or permanent custody" of the court. MCL 712A.20; MSA 27.3178(598.20). In this case, the probate court returned custody of the children to their father. Thus, the children were no longer in the "temporary custody of the court". However, for some unknown reason, the probate court orders indicated that the children were to remain "temporary wards of the court". This must be interpreted simply as an acknowledgment by the court that the children still remained under the jurisdiction of the court as provided by statute. The children in this case were no longer committed to care outside of their own home. The

essential part of the orders placed the children in their father's home.

However, in January of 1985, the allegations of physical abuse, apparently caused the court to order temporary detention of the children pending a hearing, as allowed by § 15 of the code, MCL 712A.15; MSA 27.3178(598.15). On January 21, 1985, a brief hearing occurred. However, no real evidence was presented. Nevertheless, the court apparently felt that it was appropriate for the children to again be placed in foster care. While supplemental orders of disposition may be entered under § 19 of the act as long as the children remain under the jurisdiction of the court, such orders are required to remain within the bounds of dispositional authority granted to the court in § 18 of the act. Section 18 allows the court to enter any of the various orders of disposition which are appropriate for the welfare of the child and society "in view of the facts proven and ascertained".

Even assuming that the children had been properly placed in foster care, the probate court had no authority to terminate respondent's parental rights under § 19a until a point in time after a rehearing under § 19 took place and it was decided that the children should remain in foster care in the temporary custody of the court. We must condemn the procedures followed in this case. Without a finding that the parental home had become unfit, the probate court nevertheless placed the children in foster care. Respondent was not even granted the courtesy of the statutorily mandated rehearing provided by § 19 before the court proceeded to hold the termination hearing. Even though that hearing should not have been held at that time, the court nevertheless made a final determination and order placing the children

in the permanent custody of the court on the basis of subsections (e) and (f) of § 19a.

Subsection (f) provides absolutely no support for the probate court's order. First, while the court indicated in its final order that subsection (f) provided a statutory basis for the order, there was no earlier indication that it was being considered as a ground for termination. This provision was not mentioned before or during the hearing and the evidence presented was not directed toward proof or disproof of that ground for termination. The petition was for neglect and the hearing was conducted in accordance with that petition. Second, subsection (f) is clearly inapplicable. The children had been placed in the care and custody of their father in his home. While they were thereafter placed in foster care in the temporary custody of the court, two years certainly had not gone by. Furthermore, no rehearing was held. Respondent was not even informed that he needed to establish a reasonable probability that he would be able to reestablish a proper home for the children within the twelve-month period which would follow that two-year period. Third, the trial court made no findings of fact in support of termination under subsection (f). Termination under subsection (f) was therefore totally improper.

The probate court also clearly erred in finding that respondent was unable to provide a fit home for the children by reason of neglect under subsection (e). Entry of an order for permanent custody due to neglect must be based upon testimony of such a nature as to establish or seriously threaten neglect of the children for the long run future. *Fritts v Krugh*, 354 Mich 97, 114; 92 NW2d 604 (1958). As noted earlier, due process, as well as MCR 5.908(C)(2), requires that parental rights not be terminated unless the state proves by clear and

convincing evidence that such termination is warranted. In this case, the probate court's findings were clearly erroneous. The state did not carry its burden.

The probate judge stated several findings of fact on the record in support of his decision to terminate respondent's parental rights. First, the judge found that respondent had a history of abusing children and that his 1979 conviction showed a predisposition toward violence to children. This finding was clearly erroneous. Evidence of respondent's conviction was not presented during the hearing and there was no mention of it until the judge inquired about it after the other proofs had been presented. Draper explained that the charges were brought at the instigation of Linda's mother, who apparently desired to keep Draper away from Jeffrey. The guardian ad litem took the position that respondent was likely falsely accused in the matter and indicated that he felt that in fairness to respondent the circumstances of his conviction and imprisonment should not be considered in any way against him. The judge responded that he would not consider the conviction, but that he was just curious about it. While in his discretion the judge could have considered the conviction, after indicating that he would not consider it, he should not have done so.

In support of his conclusion that respondent had a history of abusing children, the judge also found that abuse of Nicole took place in 1982. This finding was contrary to an earlier ruling by the first judge to whom the case had originally been assigned that abuse had not been established. No new evidence had been presented to the second judge regarding those incidents.

The probate judge also found that the allegations contained in the January 1985 termination

petition indicating that Linda Draper had spanked Nicole on January 5, 1985, were true. The judge was convinced that respondent knew of his wife's abuse. However, a review of the evidence discloses that respondent was not present during Nicole's spanking by Linda. The record is devoid of any testimony which would support the judge's conclusion that respondent knew of the incident. Also, there is no evidence that Linda continually abused the girls. Rather, the testimony discloses a single, unrepeated incident. This is not a case where respondent permitted the continuance of an environment in which the children were likely to be continually abused.

The probate judge further found that respondent had failed to comply with the court orders regarding counseling and parenting classes and that those failures were alone sufficient grounds upon which to terminate his parental rights. We disagree. While the social services worker testified that respondent had failed to attend many weekly counseling sessions and that the sessions were inneffectual due to lack of continuity, when the specific dates of the sessions were reviewed, it became clear that all but four of the thirty documented counseling sessions were attended. The worker did testify that she recalled an unknown number of undocumented sessions that respondent did not attend. Respondent testified that he was unable to attend all of the scheduled counseling sessions because he had started a new job and could not always take time off from work to attend. When he explained his situation to the worker, she indicated that his occasional nonattendance was acceptable. One cancelled meeting was missed because the Drapers could not get a babysitter. They were unable to attend two others because of snowstorms. These facts certainly do

not provide clear and convincing evidence of neglect.

Moreover, the probate court erred in determining that the failure to comply with the court orders was alone sufficient grounds upon which to terminate respondent's parental rights. The probate court may make orders affecting adults as in the opinion of the court are necessary for the physical, mental, or moral well-being of a particular child or children under its jurisdiction. Such orders are incidental to the jurisdiction of the court over the children. MCL 712A.6; MSA 27.3178(598.6). It can be argued that attending parenting classes and counseling sessions might be, in a given case, necessary for the physical, mental, or moral well-being of the children. Such court-imposed requirements are similar to treatment plans often entered into by agreement between parents and the DSS. However, unless such parenting classes are actually needed to improve neglectful behavior, the failure to attend such classes does not establish neglect. *In the Matter of Moore,* 134 Mich App 586, 598; 351 NW2d 615 (1984). See, also, *In the Matter of Mason,* 140 Mich App 734; 364 NW2d 301 (1985). We believe that the evidence clearly establishes that respondent made a legitimate effort to comply with the treatment program.

Moreover, his failure to abide by court orders does not establish sufficient grounds for termination since it does not establish willful neglect. Parental rights cannot be terminated for failure to abide by a court order. They can only be terminated based upon a finding of one of the criteria listed in § 19a of the juvenile code. While the failure to comply with the court orders and to attend parenting classes can be considered to the extent that such failures reflect on whether a

parent is unable to provide a fit home for a child by reason of neglect, the failure to abide by an order should not be overemphasized and is certainly not determinative of the outcome of the termination hearing. If the court is concerned about compliance with its orders, we note that it has the power to punish for contempt of court. See MCL 712A.26; MSA 27.3178(598.26). A parent may be able to provide a fit home even though he does not abide by a court order.

The probate judge also found that, because respondent had only visited his children three times since they were removed from his home in January of 1985, he had failed to show the required regular contact with his children. We disagree. It was approximately a 530-mile one-way trip from the Draper residence in the upper peninsula to the foster home in Lenawee County. We cannot understand why these children were placed in a foster home so far away from their parent. It is ridiculous to expect a parent to maintain sufficient contact with his children under such circumstances. The probate court and the Department of Social Services should have exercised a little more discretion in this area. While the proceedings concerning these children originally began in Lenawee County, nothing prevented a transfer of jurisdiction or venue to a more appropriate court in the upper peninsula if the probate court or the DSS in Lenawee County did not have the ability to provide for foster care near the parent's home. The main thrust of the juvenile code is to promote proper relationships between parents and children if at all possible. Such relationships can only be fostered if the parents have reasonable access to their children. MCL 712A.1; MSA 27.3178(598.1) states in part:

"This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive such care, guidance and control, *preferably in his own home,* as will be conducive to the child's welfare and the best interest of the state and that when such child is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to the care which should have been given to him by them." (Emphasis added.)

In addition, the Supreme Court has stated:

"The interest of parent and child in their mutual support and society are of basic importance in our society and their relationship occupies a basic position in this society's hierarchy of values. Clearly any legal adjustment of their mutual rights and obligations affects a fundamental human relationship. The rights at stake are 'protected' and encompassed within the meaning of the term 'liberty' as used in the Due Process Clause."

*Reist v Bay Circuit Judge,* 396 Mich 326, 341-342; 241 NW2d 55 (1976). In *Santosky v Kramer,* 455 US 745, 753; 102 S Ct 1388, 1394-1395; 71 L Ed 2d 599, 606 (1982), the United States Supreme Court stated:

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."

We find the failure to provide for reasonable access to the children in this case to be outrageous.

The probate judge was also very impressed by the psychiatric and psychological testimony which was presented. Dr. Lawrence Pollack testified in

regard to difficulties that the two girls were having. He testified that one cause of the girls' condition was the lack of a positive parental bond with their father. He indicated that there was a negative bond between Nicole and her father and an ambivalent bond between Stacy and her father. The doctor found that the lack of bonding was significant. He was unable to conclude whether a bond had ever existed between respondent and his daughters. He subscribed to the theory that bonding normally takes place immediately after birth through a child's first few years. Whether or not the allegations of physical abuse were true would not affect his evaluations. In response to a question asked by the judge, the doctor added that the lack of parental bonding psychologically constituted "emotional neglect". The judge, in his findings of fact, concluded that the deteriorated relationship between respondent and his daughters constituted emotional neglect under MCL 712A.19a(e); MSA 27.3178(598.19a)(e). We disagree. Under subsection (e), "neglect" necessarily entails some degree of culpability on a parent's part by either intentional or negligent disregard of a child's needs. There must be some act or omission that is blameworthy. *In the Matter of McDuel,* 142 Mich App 479, 485-486; 369 NW2d 912 (1985). A relationship may deteriorate even in the absence of emotional neglect. Apparently, the judge concluded that it was respondent's fault that no parental bond existed. Yet, the doctor testified that bonding normally takes place in a child's first few years. Upon the Drapers' divorce in 1977, custody of the girls was awarded to Beverly Draper. Before respondent was released from prison, the DSS took custody of Nicole and Stacy and they have been in foster homes for a significant amount of time. Furthermore, respondent's attempts to maintain

contact with his daughters were frustrated by the DSS. At one point, he had to resort to court action to obtain visitation with his children. Even though at one point the DSS had a foster home for the girls in Houghton County, the DSS quickly removed the girls to Lenawee County for no apparent reason. It was unconscionable for the DSS and the probate court to move respondent's daughters over 500 miles from his home and then to condemn him for failing to maintain frequent visitation and develop the consequent bonding. It is not surprising that any bond which might have existed deteriorated and that rebonding did not take place. Finally, the record shows that when respondent had an opportunity to visit with his daughters with reasonable regularity, displays of affection steadily increased.

The fact that Nicole and Stacy might be better off and might establish a bonded relationship with another adult does not support termination of respondent's parental rights. There must first be clear and convincing evidence of neglect before the best interests of the children may be considered. *In the Matter of Schejbal,* 131 Mich App 833, 836; 346 NW2d 597 (1984). The suitability of an alternative home is an improper consideration until statutory neglect has been established. *In re Mathers,* 371 Mich 516, 530; 124 NW2d 878 (1963).

In conclusion, there was very little evidence, let alone clear and convincing evidence, of neglect. The probate court clearly erred in taking permanent custody of the children and terminating respondent's parental rights. The order terminating respondent's parental rights is reversed.

The case is remanded to the probate court whereupon the court shall, without delay, return the children to the custody of their father.

Reversed and remanded.