*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HAMPTON, Minors.

UNPUBLISHED
June 13, 2019

No. 345575
Wayne Circuit Court
Family Division
LC No. 08-482243-NA

Before: SAWYER, P.J., and O'BRIEN and LETICA, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to the minor children, JMH and JH, pursuant to MCL 712A.19b(3)(a)(*ii*) (parent deserted child), MCL 712A.19b(3)(g) (parent failed to provide proper care and custody), and MCL 712A.19b(3)(h) (parent imprisoned and child will be deprived of a normal home for a period exceeding 2 years). We affirm.

## I. FACTUAL BACKGROUND

This family's history with Child Protective Services (CPS) dates back at least 10 years. In 2008, JMH and another child, JU, were removed from the care of their mother amidst allegations of abuse and neglect. A petition was filed and the children were made temporary wards of the court. Approximately 18 months into the wardship, mother identified respondent as the father of both JMH and the unborn child she was then carrying. In 2010, respondent established paternity of JMH through the execution of an affidavit of parentage. Mother gave birth to JH later in 2010, but respondent did not establish paternity at that time as he was incarcerated.

After respondent established paternity to JMH in 2010, he participated in services available to an incarcerated parent, including two parenting classes, an anger management class, and substance abuse treatment as part of the assaultive offenders program. As part of the 2008 case, mother participated in services and was eventually deemed compliant with her treatment plan. As a result, in April 2011—nearly 3 years after the case began—the court returned the children to mother's care with reunification services in place, and the wardship was later

-1-

terminated in October 2011. In the years that followed, however, CPS investigated the family several times after receiving complaints of abuse and neglect.

In September 2016, mother was living with Dalrois Coleman, their two children—JC and JMC—respondent's two children, and JU. Mother was also pregnant with a sixth child. At this time, respondent was again incarcerated. In September 2016, nine-year-old JU was examined at Children's Hospital of Michigan because of behavioral issues. During this medical intervention, JU reported that he was deprived of food and frequently beaten by mother and Coleman. A CPS investigation revealed that respondent's children, JMH and JH, were also physically abused by mother and Coleman. In October 2016, the children were removed from the care of mother and Coleman.

In October 2016, petitioner filed a petition requesting that the court take jurisdiction of the children and terminate the parental rights of respondent, mother, and Coleman.[1] At the time the petition was filed, respondent was incarcerated on both state and federal charges, and he remained incarcerated throughout the two years this case was pending. In early 2017, DNA testing confirmed that respondent was JH's biological father. Consequently, the petition was amended to reflect respondent's legal status as JH's father.

The termination hearing was held over 10 days between October 2017 and June 2018. At the conclusion of the hearing, the court terminated respondent's parental rights pursuant to MCL 712A.19b(3)(a)(*ii*), (g), and (h). This appeal ensued.

## II. STATUTORY GROUNDS FOR TERMINATION

For his first issue on appeal, respondent argues that the trial court erred when it found that petitioner established statutory grounds for termination of his parental rights. In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent's parental rights pursuant to MCL 712A.19b(3)(a)(*ii*), (g), and (h). At the time of the termination hearing, these statutory provisions permitted termination of parental rights under the following circumstances:

> (a) The child has been deserted under either of the following circumstances:

---

[1] Mother and Coleman later entered pleas to the court's jurisdiction, the existence of statutory grounds for termination, and acknowledging that termination of their parental rights was in the children's best interests. Thereafter, the court entered orders terminating their parental rights to the children. Mother and Coleman are not parties to this appeal.

* * *

(*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.

* * *

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[2]

(h) The parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding 2 years, and the parent has not provided for the child's proper care and custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

After reviewing the record, we conclude that the trial court did not err when it terminated respondent's parental rights under the foregoing grounds.

Before addressing the substance of respondent's claim on appeal, we note that the trial court found three statutory grounds for termination, but respondent only contests two grounds in his brief on appeal. "The failure to brief the merits of an allegation of error is deemed an abandonment of the issue." *In re JS & SM*, 231 Mich App 92, 98; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo*, 462 Mich at 353 n 10. Because only one statutory ground for termination must be established by clear and convincing evidence, respondent's failure to challenge the trial court's finding with respect to MCL 712A.19b(3)(a)(*ii*)

---

[2] MCL 712A.19b(3)(g) was amended by 2018 PA 58, effective June 12, 2018. As amended, this subsection now provides:

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

The supplemental permanent custody petition, filed on April 21, 2017, cited the preamendment version of the statute that was in effect at the time. The hearing on the permanent custody began on October 12, 2017. The statutory grounds phase of the hearing concluded on April 6, 2018— before the effective date of the amendment. The court entered the order finding statutory grounds to terminate respondent's parental rights on April 9, 2018. After the best-interest hearing, the court entered the order terminating respondent's parental rights on June 27, 2018. Because the court's order regarding statutory grounds was entered before the effective date of the amendment, the former version of the statute applied.

precludes appellate relief with respect to his challenge to the statutory grounds. *In re JS & SM*, 231 Mich App at 98-99. Even addressing the other grounds for termination, we conclude that the trial court did not clearly err by finding that the grounds were established by clear and convincing evidence.

At the time of termination, JMH was 10 years old and JH was eight years old. During most of their lives, respondent made little to no effort to maintain a relationship with the children. Respondent did not establish paternity of JMH until the child was two years old. JH was six years old before respondent established a legal relationship with his son and that only occurred as a consequence of these proceedings. While respondent was incarcerated for several years after the children were born, even when he was at liberty, he did not provide for their needs or make any effort to be a part of their lives. Based on his testimony, respondent's only apparent involvement with the children was (1) in approximately 2010 when he cared for JMH for three weeks while mother was in jail, (2) when he spent some time with both of the children in 2011 at his house, and (3) when he cared for JMH for a weekend in December 2014. Respondent testified that neither of the children were in his care after 2014, but he claimed to have made several attempts to visit the children when he was not incarcerated. He also claimed that he saw JMH in 2016 at her aunt's house. Respondent admitted that he never participated in any of the children's school conferences or medical appointments. Other than the contact testified to by respondent, there was no evidence that he made an effort to care for or support the children.[3]

Respondent claimed that he provided financially for the children. He testified that he bought clothing, Christmas gifts, "and several things for them." This testimony was defeated, however, by his admission that he never actually gave these things to the children. Accordingly, there was no competent evidence that respondent ever financially provided for the children.

Respondent also asserts that the children's mother precluded him from having contact with JMH and JH. He claims that mother moved frequently and did not answer his phone calls. While there was evidence that mother moved frequently in the five years before the filing of the petition, there is little evidence that this precluded respondent from having contact with the children. Indeed, on at least one occasion, respondent was able to locate the children. Respondent testified that when he was released from prison in December 2014, he located mother's telephone number, contacted her, and then spent one weekend with JMH. Thus, it appears that respondent lacked the desire, rather than the ability, to be involved with the children. This was further demonstrated by respondent's decision to never take legal action to gain custody or visitation of the children. Respondent attempts to reason that he never took any actions to be more involved with the children's lives because he was "respecting" mother's

---

[3] Respondent argues that his rights were prematurely terminated because he should have had services provided to him and had the opportunity to take classes while in prison. However, because the goal was never reunification, the DHHS was not required to make reasonable efforts toward reunification. Nonetheless, the DHHS did make reasonable efforts in that it investigated relative placement, allowed respondent to have telephone calls with the children, and respondent reportedly participated in a variety of services that were available to him in prison.

relationship with Coleman. Yet, on one occasion, respondent and Coleman ran into each other at a marijuana dispensary, and respondent's children were in Coleman's car, but respondent did not even ask to see the children. Thus, it seems that respondent's decision to not be involved with the children was less motivated by his "respect" for mother's relationship with Coleman, and more out of his willingness to simply abdicate his parental responsibility to mother and Coleman rather than establishing a relationship with the children or providing for them. Tragically, this abandonment of the children allowed them to live in a home where physical abuse and neglect were common place.

Respondent argues that there was no evidence that he could not comply with a treatment plan in the future when he is released from prison. This argument is without merit. During much of the children's lives, respondent was incarcerated. He testified that between 2012 and 2014, he was imprisoned for 18 months after pleading guilty to receiving or concealing a motor vehicle. In the fifteen months that respondent was not incarcerated, he only saw JMH for a single weekend. He was then imprisoned again in March 2016. Respondent explained that he was being held on both pending federal charges and a state parole violation. The trial court found that respondent's latest release date for the state offense was 2027. Respondent reluctantly disclosed that the federal charges included money laundering, drug trafficking, and a conspiracy charge related to a witness. Respondent remained imprisoned throughout the two years this proceeding was pending in the trial court. On the last day of the hearings, June 27, 2018, respondent testified that he had pleaded guilty to the federal charges and was awaiting sentencing. Whenever respondent is released, he will still have to obtain housing and employment, and participate in and benefit from services before he would be permitted unsupervised visitation with the children. Based on the foregoing evidence, the trial court did not clearly err when it concluded that respondent will be imprisoned for such a period that the children would be deprived of a normal home for a period exceeding two years.

Respondent argues that the trial court terminated his parental rights simply because of his imprisonment and that the court erred when it failed to place the children with family. It is true that the mere present inability to personally care for one's children as a result of incarceration does not constitute grounds for termination. *In re Mason*, 486 Mich 142, 160; 782 NW2d 747 (2010). A parent can achieve proper care and custody through placement with a relative. *Id*. at 161 n 11. However, the evidence failed to show that there existed an appropriate individual willing and able to care for the children in respondent's absence. At the time of termination, JH was placed in a licensed foster home. JMH was residing in a residential facility. Respondent offered his mother and sister as substitute caregivers while he was unavailable. Petitioner investigated these individuals as well as other family members as potential caregivers. Some family members never returned petitioner's calls. With respect to the paternal grandmother and aunt, petitioner concluded that these proffered caregivers were not appropriate because of prior CPS histories and legal issues. In addition, respondent's mother, while testifying that she wished to plan for the children, stated that she was not prepared to take custody of them because she already had two grandchildren in her care and lacked appropriate housing to accommodate two more.

Respondent also argues that he has a fundamental liberty and privacy interest in the care, custody, and control of the children under the Fifth, Ninth, and Fourteenth Amendments to the United States Constitution. "The Due Process Clause provides heightened protection against

government interference with certain fundamental rights and liberty interests." *In re B & J*, 279 Mich App 12, 22; 756 NW2d 234 (2008) (quotation marks and citation omitted). "It is undisputed that parents have a fundamental liberty interest in the companionship, care, custody, and management of their children." *Id*. at 23. "In order to comply with the guarantees of substantive due process, the state must prove parental unfitness by 'at least clear and convincing evidence' before terminating a respondent's parental rights." *Id*. (quotation marks and citation omitted). "Michigan law fully comports with this requirement, requiring proof of at least one statutory ground 'by clear and convincing evidence' before the family court may terminate a respondent's parental rights." *Id*., quoting MCL 712A.19b(3). "Once the petitioner has presented clear and convincing evidence that persuades the court that at least one ground for termination is established under subsection 19b(3), the liberty interest of the parent no longer includes the right to custody and control of the children." *In re Trejo*, 462 Mich at 355. Therefore, so long as petitioner satisfied its burden of establishing one ground for termination under MCL 712A.19b(3) by clear and convincing evidence, respondent's constitutional rights were not violated. Here, as explained, the evidence presented by petitioner established multiple grounds for termination by clear and convincing evidence, and as a result, respondent's constitutional right to parent the children was not violated.

In sum, respondent did not provide for the children's proper care and custody before he was imprisoned. Indeed, he abandoned them when he totally relinquished the responsibility of parenting the children to their abusive mother and her partner. Despite arguments to the contrary, respondent has not provided for their care and custody while imprisoned. Because respondent deserted the children with their mother, never provided proper care and custody for the children, and is not likely to be able to provide for the children anytime in the foreseeable future, the evidence supports that the trial court did not clearly err in terminating respondent's parental rights under MCL 712A.19b(3)(a)(*ii*), (g), and (h).[4]

## III. BEST INTERESTS

Respondent also argues that the trial court erred when it found that termination of his parental rights was in the children's best interests. We disagree.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability and finality, and

---

[4] Respondent also argues that public policy requires that natural parents have custody of their children if possible. In support of his argument, he cites *In re Mathers*, 371 Mich 516 (1963) as well as statutory law. In *Mathers*, our Supreme Court found that mother had established a suitable home and surroundings appropriate to her child's needs. The same cannot be said for respondent, and respondent's argument fails based on the trial court's finding of statutory grounds for termination.

the advantages of a foster home over the parent's home. *In re Olive/Metts,* 297 Mich App 35, 42; 823 NW2d 144 (2012). The court may also consider psychological evaluations, the child's age, a parent's continued involvement in domestic violence, and a parent's history. *In re Jones,* 286 Mich App 126, 131; 777 NW2d 728 (2009). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss,* 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones,* 286 Mich App at 129.

The trial court did not clearly err when it found that termination of respondent's parental rights was in the children's best interests. At the time of termination, the children had been in care for almost two years. Both of the children had been significantly traumatized by severe physical abuse in the home. JH was suffering from post-traumatic stress disorder. There was also evidence that JMH was struggling with emotional and behavioral issues. The children required a safe and stable home if they were to have any chance at achieving healthy growth and development. Respondent had not provided the safety and stability the children require. In challenging the trial court's best-interest findings, respondent once again argues that it was in the children's best interests to be placed with their maternal grandmother or aunt. However, the evidence demonstrated that these proffered caregivers were unsuitable. In addition, placing JH with his grandmother, an individual he did not even know, would have been detrimental to his well-being. JH's treating therapist testified that any deviation in JH's routine caused him to decompensate. Consequently, the therapist recommended keeping JH's world "as small as possible" and introducing as few new elements as possible.

Further, there was insufficient evidence that respondent, even if he were available to parent the children, had the capacity to do so. Respondent engaged in a lifestyle that suggests that he would be unwilling to put the children's needs ahead of his own. This would be particularly detrimental to two children who have been severely traumatized. Respondent testified regarding at least two events that indicated that he could not recognize when the children were in danger. Respondent claimed that when JMH was very young and visiting with him, she disclosed that she did not want to go home because her mother "whooped" her for being bad. On another occasion, a friend helping care for JMH noticed marks on the child's back. Respondent claimed that he asked mother about the marks, but there is no evidence that he did anything to ensure his daughter's safety. Respondent lacked the parenting skills necessary to ensure the safety of two children with special needs.[5]

---

[5] Respondent again argues that he has a fundamental liberty interest in the care, custody, and management of the children and that public policy requires natural parents have custody of their children, but based on respondent's lack of parenting skills, desertion of the children, and inability to consider the children's needs before his own, this argument is without merit. Respondent also repeated the argument that he should have been given the opportunity to plan for reunification; however, because the goal for respondent and the children was never reunification, the DHHS was not required to make reasonable efforts, yet still did by trying to locate a suitable family member for the children and allowing respondent to have telephone communication with the children.

Respondent asserts that a bond existed between him and the children that would weigh against terminating his parental rights. However, there is little to no evidence that a parent-child bond existed. The evidence established that respondent has had no meaningful relationship with the children their entire lives. Indeed, the children looked to their mother's partner, Coleman, as a father figure. Both children called Coleman "daddy." JH, in particular, did not recognize respondent as his father. For instance, JH's foster care caseworker testified that respondent's letters to JH were read to him and in response, JH would specifically say, "this is not my dad. I do not know him." Respondent also sent pictures to JH, who would state that he did not know the people in the pictures. JH further indicated that he did not want to send letters or pictures to respondent.[6] In addition, JMH's psychologist recommended that she not have telephone contact with respondent because it could be psychologically detrimental to her because respondent was making false promises that he would be released from prison and that they would become a happy family. In any event, to the extent that a bond might have existed, that factor does not outweigh the children's need for a safe and stable home. Given the children's young ages, and their special needs, it is critical that they be placed with someone who can provide adequate care and supervision. Accordingly, the trial court did not clearly err by finding that it was in the children's best interests to terminate respondent's parental rights.

Affirmed.


/s/ David H. Sawyer
/s/ Colleen A. O'Brien
/s/ Anica Letica

---

[6] Respondent argues that there was no evidence presented that the children wanted his rights terminated. However, JH did not recognize respondent as his father and the trial court found that both children required stability and permanency now, neither of which respondent could provide at the time of the hearing or in the near future.